# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
INDEX NO. 14 Civ. 4018 (JMA)(AKT)

X------------------------------------------
AVEMARIA THOMPSON,

                              Plaintiff,

        -against-

THOMAS J. SPOTA, ROBERT EWALD and SUFFOLK COUNTY,


                              Defendants.
X------------------------------------------


        **EXAMINATION BEFORE TRIAL** of AVEMARIA

THOMPSON, as taken by and before MARY A. PAVLIK, a

Shorthand Reporter and Notary Public of the States of

New Jersey/New York, held at the offices of PUTNEY,

TWOMBLY, HALL & HIRSON, LLP, 1205 Franklin Avenue,

Garden City, New York on Monday, November 23, 2015,

commencing at 10:24 in the forenoon.


**PAVLIK PROFESSIONAL REPORTING**
Certified Court Reporters
2 Dolphin Court
Forked River, New Jersey  08731
609.242.4003
pavlikproreporting@comcast.net

1 started in the Narcotics Bureau?
2     A    2010 maybe, around 2010.
3     Q    Maybe around 2010. Do you know what year
4 you started with the district attorney?
5     A    Yes. August 4, 2003.
6     Q    Do you remember what season it was --
7     A    During fall.
8     Q    -- when Mr. Ewald asked you to read this
9 poem?
10     MR. SOLOTAROFF:   Let her ask the
11 questions.
12     THE WITNESS:  I'm sorry.
13     A    It was during the fall, to the best of my
14 recollection.
15 BY MS. DONNELLY:
16     Q    But you don't recall the year?
17     A    It was while I was there, when I just --
18 within a year of getting to Narcotics, I was asked
19 to read it.
20     Q    Who was present?
21     A    Jay Mellito, Beth Crayton, John
22 Scarlatto. There were a few other people there.
23 Joe Carroll. There was a few other people there.
24     Q    And it was in the afternoon?
25     A    Correct.

1     Q    And it was a Friday?
2     A    Yes.
3     Q    And it was in the fall?
4     A    Yes.
5     Q    What else did you tell your husband
6 about?
7     A    I told him about how I felt working
8 there, all the things that they were doing to me.
9     Q    Such as?
10     A    Well, when I first got there, I
11 brought -- they told me to bring in something to
12 eat. They were having a get-together, a gathering,
13 and everybody was to bring in something and I
14 brought in dip and chips. And when I brought in the
15 dip, Pat Gunn opened it up and he said it smelled
16 like a dirty pussy. And I -- you know, I was new to
17 the Bureau, that's when it all started. I said to
18 him that I got it from Stop & Shop and I checked the
19 date on it and I said there's nothing wrong with it.
20 And that was my entry into Narcotics and the jokes
21 and all the -- the things.
22     Q    And you said you were new to the Bureau?
23     A    At that time, yeah.
24     Q    When was this?
25     A    That was around -- that was when Pat was

1 there and -- Pat Gunn was there. It was around
2 2010.
3     Q    Who else was present for that?
4     A    Meg Farrell, John -- John and Jay Sudics.
5     Q    Where did this occur?
6     A    In the conference room, which was also
7 the lunchroom.
8     Q    What time of day?
9     A    In the afternoon.
10     Q    Anything else you told your husband
11 about?
12     A    I told him about how John would stand by
13 the door when I'd come in the morning and laugh
14 at me in the mornings and just making fun of me
15 every morning.
16     Q    And this was every morning?
17     A    Pretty often for about a year.
18     Q    What year?
19     A    That was 2011, approximately 2011 to
20 2012.
21     Q    When you say "make fun" of you, what
22 would he say?
23     A    He would laugh. Whatever I was wearing,
24 if it was my hat, he would make fun of my hat. He
25 was just always making fun of me every day, all the

1 time.
2     Q    Any racial comments to you?
3     A    No.
4     Q    Did he do this to any other ADAs?
5     A    No, he did not.
6     Q    How do you know that?
7     A    Because I was there for all those years.
8 I was there three to four years.
9     Q    Were you there in the morning, on time,
10 every day for three to four years?
11     A    No, I was not.
12     Q    So do you know whether or not he joked
13 with other ADAs?
14     MR. SOLOTAROFF:   Objection to the form.
15 Asked and answered.
16     You can answer the question again,
17 Miss Thompson.
18     A    I do not know if he did that to other
19 ADAs. I only know what he did to me.
20 BY MS. DONNELLY:
21     Q    Anything else you spoke to your husband
22 about?
23     A    That was -- I think that was pretty much
24 it. You know, I think that was the gist of it.
25 John bothering me and being called a monkey and the

1     A     I don't know.
2     Q     Any other compensatory damages that
3 you're claiming?
4     A     I guess whatever's stated.
5     Q     Nothing is stated. I'm asking you what
6 you're looking for.
7     MR. SOLOTAROFF: Objection to the form.
8     A     I don't even know how to answer that.
9 BY MS. DONNELLY:
10     Q     It's your Complaint. I'm asking what
11 other damages are you looking for, other than what
12 you just testified to.
13     A     I don't even think that I -- other than
14 what I've testified to, I just want my life back
15 before I got to Narcotics. I want to be made whole
16 for -- what am I looking for? I mean, I think it's
17 clearly stated.
18     Q     Obviously I don't, which is why I'm
19 asking for you to clarify.
20     Now, you told me what you were looking
21 for in terms of lost wages. You told me what you
22 were looking for in terms of lost health benefits.
23     A     Right.
24     Q     Are there any other damages that you're
25 claiming?

1     A     To the best of my recollection, I think
2 that's it.
3     Q     After your employment was terminated with
4 the District Attorney's office, did you file for
5 unemployment?
6     A     I did.
7     Q     Did you receive unemployment?
8     A     I did not.
9     Q     What was the basis of the denial of your
10 unemployment?
11     MR. SOLOTAROFF: Objection to the form.
12     A     That I don't know. She said that I could
13 have -- she -- the woman called me and started
14 talking to me -- oh, she said because I was late.
15 She said because I was late and that she started
16 explaining how I would be -- what I could do. And I
17 didn't -- I said I didn't want to pursue that
18 anymore. Once I was like, everybody told me you
19 should file for unemployment, so I did. And then
20 she called to say that I -- you know, I was going to
21 have to have a hearing and this and that. And I
22 said, no, that I just -- you know, I was just hoping
23 I get another job and that would be it.
24 BY MS. DONNELLY:
25     Q     Who is "she"?

1     A     The woman who called from the
2 unemployment office.
3     Q     And do you currently have health
4 benefits?
5     A     I do.
6     Q     And through who do you have health
7 benefits?
8     A     My husband.
9     Q     Your husband is currently employed?
10     A     Yes.
11     Q     What's his position?
12     A     He's a banker.
13     Q     At the time you were employed with the
14 District Attorney's office, did you have benefits
15 through the D.A.'s office?
16     A     Yes.
17     Q     In your Complaint you're also looking for
18 the defendants to reinstate you to your position?
19     MR. SOLOTAROFF: Objection to the form.
20 BY MS. DONNELLY:
21     Q     Are you still seeking to be reinstated to
22 your position at the District Attorney's office?
23     A     No.
24     Q     And you're also seeking punitive damages.
25 What punitive damages are you seeking?

1     MR. SOLOTAROFF: Objection to the form.
2     A     Damages for how I was treated.
3 BY MS. DONNELLY:
4     Q     And what amount?
5     A     I don't have a number.
6     Q     What year did you graduate from law
7 school?
8     A     2000.
9     Q     What year did you pass the Bar exam?
10     A     2001. I -- I passed it the first time,
11 so I -- I passed it in 2000, so I took it and passed
12 it in 2000.
13     Q     What was your first job out of law
14 school?
15     A     The Queens D.A.'s office.
16     Q     And were you assigned to any specific
17 bureau when you started Queens D.A.'s office?
18     A     Intake Bureau.
19     Q     How long were you in the Intake Bureau?
20     A     Maybe six months to a year.
21     Q     What were your responsibilities at the
22 Intake Bureau?
23     A     Arraignments, write up cases, people --
24 Complaint that comes in, write up cases, charges.
25     Q     Try cases?

```
1    A     No. Write up, meaning --
2    Q     No. I'm asking, did you try cases?
3          MR. SOLOTAROFF:   You mean in the Intake
4    Bureau, is that what you're asking?
5    BY MS. DONNELLY:
6    Q     What's your answer?
7          MR. SOLOTAROFF:   I just want to make sure
8    your question is clear.  You wouldn't want her to
9    answer a question that was confusing, for sure.
10   BY MS. DONNELLY:
11   Q     After the Intake Bureau, where did you
12   go?
13   A     Criminal court.
14   Q     What was your position in criminal court?
15   A     I was an ADA.
16   Q     What were your responsibilities, I meant
17   to ask?
18   A     The hearings, the trials, the daily
19   calendar, motions.
20   Q     What kind of cases did you try?
21   A     Just different cases. It's district
22   court. It's kind of like a district court, so it's
23   misdemeanors.
24   Q     How long were you in criminal court?
25   A     Maybe two years, approximately, maybe a
```

```
1    year and a half.
2    Q     Where did you go after criminal court?
3    A     Appeals.
4    Q     What were your responsibilities in the
5    Appeals Bureau?
6    A     To handle appellate cases.
7    Q     Did you argue appellate cases?
8    A     Uh-hum.
9    Q     Where?
10   A     I guess the second -- in downtown
11   Brooklyn, the second -- it was Second Division, I
12   believe.
13   Q     Did you actually argue cases before the
14   Second Division?
15   A     I argued one case and -- yeah.
16   Q     When did you argue that case?
17   A     That I don't know.  During appeals.
18   Q     How long were you in the Appeals Bureau?
19   A     Maybe about six months.
20   Q     After the Appeals Bureau, what did you
21   do?
22   A     I went to Suffolk D.A.'s office.
23   Q     Why did you leave the Queens District
24   Attorney's office?
25   A     Suffolk was closer to where I lived.  It
```

```
1    was five minutes away.
2    Q     Did you apply for open position in the
3    Suffolk D.A.'s office?
4    A     I don't think so.  I think I just wrote a
5    letter.
6    Q     Who did you write a letter to?
7    A     I don't know.
8    Q     You don't know who you wrote a letter to?
9    A     It could have been Bob Carroll, but I'm
10   not sure.
11   Q     Did you prepare for this deposition?
12   A     No.
13   Q     Did you meet with your attorney to
14   prepare for this deposition?
15   A     Oh, yes.
16   Q     When did you meet with him?
17   A     On Thursday.
18   Q     How long did you meet with him?
19   A     Like, two hours, an hour and a half, two
20   hours.
21   Q     Did you review any documents in
22   connection with your preparation?
23   A     The Complaint and Interrogatories.
24   Q     Did you review any of the documents that
25   were produced in this case?
```

```
1    A     No.
2    Q     Have you ever been diagnosed with any
3    condition that would affect your long-term or short-
4    term memory?
5    A     No.
6    Q     Do you experience any problems with your
7    memory?
8    A     No.
9    Q     Would you consider yourself to have a
10   pretty good memory?
11   A     I think it's just average.
12   Q     At the time you were transferred from the
13   Criminal Court Bureau to the Appeals Bureau in the
14   Queens District Attorney's office, did they tell you
15   why you were being transferred to the Appeals
16   Bureau?
17   A     They asked me where I wanted to go; I
18   said Appeals.
19   Q     Why did you want to go to Appeals?
20   A     I thought it would be interesting.
21   Q     You tried cases in the Criminal Court
22   Bureau?
23   A     Yes.
24   Q     You did not want to continue to try
25   cases?
```

1      A     It wasn't -- the Appeals Bureau is not a
2  permanent spot. It would just be for a little while
3  and then you would just go back to a trial bureau.
4                MS. DONNELLY:   Would you mark that?
5                (Bates D 275 is received and marked
6  Defendant Exhibit D-5 for identification.)
7  BY MS. DONNELLY:
8      Q     Have you seen that letter before?
9      A     Yes.
10     Q     Is that your signature on the letter?
11     A     It is.
12     Q     Who is the letter to?
13     A     Mr. Spota.
14     Q     So when you wrote a letter to the
15 District Attorney's office for a position, who did
16 you write the letter to?
17     A     Mr. Spota.
18     Q     In fact, you had met him at some event
19 prior to writing him the letter, correct?
20     A     Yes. Wait. Yes.
21     Q     Did you receive a response to your
22 letter?
23     A     I did.
24     Q     Excuse me?
25     A     I did.

1      Q     Who did you receive a response from?
2      A     I don't know exactly who the person was,
3  but I did receive an interview.
4                MS. DONNELLY:   Would you mark that?
5                (Bates D 274 is received and marked
6  Defendant Exhibit D-6 for identification.)
7  BY MS. DONNELLY:
8      Q     Have you seen this document before?
9      A     Yes.
10     Q     Who is that document from?
11     A     Robert Kearon.
12     Q     Was that letter in response to your
13 letter to District Attorney Spota?
14     A     Yes.
15     Q     All you have to do is read the first line
16 of the letter which says, "District Attorney Thomas
17 J. Spota has referred your letter of April 28, 2003
18 to me."
19                MR. SOLOTAROFF:   Objection to the form.
20 BY MS. DONNELLY:
21     Q     Do you recall receiving the letter?
22     A     Yes. Not -- I remember receiving a
23 letter like this.
24     Q     Did you receive any other letter from the
25 D.A.'s office regarding your initial letter from

1  D.A. Spota?
2      A     I don't recall. That was 15 -- I mean,
3  12 years ago.
4      Q     Did you contact Vivian Long to
5  schedule --
6      A     Yes.
7      Q     You remember that?
8      A     Well, if it says to contact her, I would
9  contact her.
10     Q     Do you remember contacting Vivian Long to
11 schedule an interview?
12     A     Specifically speaking with Vivian Long,
13 no, I do not.
14     Q     Do you remember an interview with the
15 D.A.'s office?
16     A     Yes.
17     Q     Who did you interview with?
18     A     Bob Kearon and another person who's
19 retired now. I could picture his face, I just can't
20 think of his name right now. Two people.
21     Q     What was Bob Kearon's title?
22     A     I think Mr. Heilig has his title now.
23     Q     I didn't ask what Mr. Heilig's title was.
24     A     I think he was, like, third in charge.
25     Q     What was his job title?

1      A     That I don't know, but I know he was
2  third in charge. Banore, John Banore was the other
3  person who interviewed. He was second in charge, I
4  believe.
5      Q     What was his job title?
6      A     I don't know what his job title was.
7      Q     After your interview with Mr. Kearon or
8  Mr. Banore, were you offered a position in the
9  D.A.'s office?
10     A     I was.
11     Q     How did you receive that offer?
12     A     By a letter.
13     Q     Who was the letter from?
14     A     I think it may have been Mr. Spota.
15                MR. SOLOTAROFF:   Excuse me for a second.
16 Can we just take a bathroom break?
17                (Brief recess.)
18                (Time noted: 2:19 p.m.)
19                (Bates D 273 is received and marked
20 Defendant Exhibit D-7 for identification.)
21 BY MS. DONNELLY:
22     Q     Have you seen that document before?
23     A     Yes.
24     Q     Tell me what it is.
25     A     It is an invitation to join the Suffolk

1     County District Attorney's office.
2     Q     It's an offer letter, correct?
3     A     Correct.
4     Q     Did you accept the offer?
5     A     I did.
6     Q     How did you accept the offer?
7     A     It said to call Elaine Reffelt and I did.
8     Q     And the letter was signed by District
9     Attorney Spota, correct?
10     A     Correct.
11     Q     He was the one that offered you
12     employment, correct?
13     A     Correct.
14     Q     At the time that District Attorney Spota
15     offered you employment, he knew you were African
16     American, correct?
17     MR. SOLOTAROFF:    Objection.
18     You can answer if you know whether he
19     knew that.
20     A     I don't know what he knew. I would
21     assume, but I don't know what he knew. I don't know
22     if his colleagues explained to him, she's African
23     American.
24     BY MS. DONNELLY:
25     Q     Well, you met him before?

1     A     True. So, yes, he did.
2     Q     In fact, your meeting before was the
3     basis of your letter to –
4     A     Correct.
5     Q     – the D.A., correct?
6     A     Yes.
7     Q     Did he encourage you to apply for a
8     position at that time?
9     A     No. He was just conversational, social.
10     Q     When did you start your employment with
11     the D.A?
12     A     August 4th, I believe, 2003.
13     Q     At the time you started your employment
14     with the D.A.'s office, did you receive any sort of
15     orientation?
16     A     Yes.
17     Q     What kind of orientation did you receive?
18     MR. SOLOTAROFF:    Objection to the form.
19     A     What do you mean exactly?
20     BY MS. DONNELLY:
21     Q     What was your orientation comprised of?
22     A     At the D.A.'s office, it comprised of
23     showing you around the D.A.'s office and acquainting
24     you, acclimating you with the rules and procedures.
25     Q     Anything else? Did they explain policies

1     to you?
2     A     Yes.
3     Q     Did they provide you with copies of
4     policies?
5     A     Yes.
6     Q     Have you sign documents?
7     A     The D.A.'s office, yes. I don't think it
8     was the D.A.'s office, it was more the county
9     attorney's office.
10     Q     So the county attorney's office took part
11     in the orientation process?
12     A     That's what I remember.
13     Q     Did you have to fill out any paperwork
14     for the D.A.'s office?
15     A     Yes.
16     Q     Was that done on the 4th?
17     A     No. That was done prior to.
18     Q     Did you receive any equipment from the
19     D.A.'s office?
20     A     I didn't receive any equipment.
21     Q     Did you receive a badge?
22     A     A badge and a few books.
23     Q     Did you receive an access key?
24     A     An access key and a card.
25     Q     What was the purpose of the access key?

1     A     To enter the building.
2     Q     Enter what building?
3     A     The building, wherever you were going to
4     work, you got a card to enter that particular
5     building.
6     Q     When you started your employment with the
7     D.A.'s office, what building did you work in?
8     A     The criminal court building, 400 Carleton
9     Avenue.
10     Q     And what bureau were you assigned to?
11     A     Criminal court.
12     Q     What bureau were you assigned to?
13     A     District Court Bureau.
14     Q     What were your responsibilities in the
15     District Court Bureau?
16     A     To handle calendar in the courtroom,
17     motions, hearings, and trials and respond to
18     discovery.
19     Q     What kind of cases did you handle in the
20     District Court Bureau?
21     A     I was assigned to general cases for the
22     part as well as sex offenses.
23     Q     Were these violations, infractions,
24     misdemeanors?
25     A     Misdemeanors, including violations and

1     A    He spoke to Erin Show and I about being
2  on time.
3     Q    Was there a problem with your timeliness
4  when John spoke to you?
5     MR. SOLOTAROFF:  Objection to the form.
6     A    I would assume so at that time.  That day
7  both Erin and I came in late.
8  BY MS. DONNELLY:
9     Q    Was he referencing just one lateness or a
10  pattern of lateness?
11     MR. SOLOTAROFF:  Objection to the form.
12     A    That I don't remember, but I know he
13  spoke to us that day.
14  BY MS. DONNELLY:
15     Q    After he spoke to you, did you experience
16  any further problems with your timeliness in the CAB
17  Bureau?
18     A    No, not that I recall.
19     Q    Do you recall when he spoke to you?
20     A    That I don't remember.
21     Q    Were you counseled for timeliness when
22  you were in the District Court Bureau?
23     A    No.
24     Q    Other than being counseled for
25  timeliness, were you counseled for anything else --

1     A    No.
2     Q    -- when were you in the CAB Bureau?
3     A    No, I was not.
4     Q    I think you testified that you were in
5  CAB for one year?
6     A    Correct.
7     Q    During that year in CAB, did you
8  experience any discriminatory conduct?
9     A    No.
10     Q    Did you have any conflicts with any of
11  your co-workers?
12     A    No.
13     MR. SOLOTAROFF:  Objection to the form.
14  BY MS. DONNELLY:
15     Q    Did any of your co-workers ever complain
16  about you?
17     MR. SOLOTAROFF:  Objection to the form.
18     A    I don't know of anybody complaining about
19  me.
20  BY MS. DONNELLY:
21     Q    That you're aware of.
22     A    Yeah. No.
23     Q    After CAB, did you transfer to another
24  bureau?
25     A    That's when I was transferred to

1  Narcotics.
2     Q    When did you transfer to Narcotics?
3     A    2009.
4     Q    So earlier you had testified that you
5  started in the Narcotics Bureau in 2010, but it was
6  actually 2009 that you started in the --
7     A    Correct.
8     Q    When you transferred to the Narcotics
9  Bureau, who was your bureau chief?
10     A    It was Bob Ewald.
11     Q    What were your job responsibilities as an
12  ADA in the Narcotics Bureau?
13     A    I was assigned on the diversion cases and
14  forged instrument cases. So my responsibilities
15  were with the drug court cases to -- well, they were
16  similar to drug court, diversion cases was to
17  determine whether or not we were going to recommend
18  the person to do a drug court instead of going to a
19  different court, a regular courtroom to handle their
20  cases. And if they were successful in drug
21  treatment, then the charges would be reduced.
22     Q    These are the diversion cases?
23     A    Correct.
24     Q    Is the program that you're referring to,
25  the Judicial Diversion --

1     A    Correct.
2     Q    Judicial Diversion Program?
3     A    Yes.
4     Q    With respect to that program, what were
5  your responsibilities?
6     A    I kept track of attendance records,
7  whether or not the defendant reported to court and
8  if they tested positive or negative or any
9  reprimands, if they're doing well in school, sort of
10  thing, and do reports, submit reports regarding how
11  successful the program was.
12     Q    For how long did you submit reports?
13     A    The entire time I was there, four years.
14     Q    There didn't come a time when the reports
15  were no longer required?
16     A    Yes. Actually, there was a time when the
17  program -- the funding stopped. The funding had
18  stopped, but I was informed that they may start the
19  program up again, so I still kept track of
20  everything.
21     Q    When did the funding stop?
22     A    I think around December before I was let
23  go.
24     Q    December of '13?
25     A    Yes.

1  Q  '12?
2  A  '12.
3  Q  Who advised you that the funding had
4  stopped?
5  A  It may have been Katie Moran.
6  Q  When you say that the funding had
7  stopped, that's just for the creation of the
8  reports, correct?  Or was it for the who JDP?
9  A  Meaning that the funding -- I think
10  initially they just gave the funding to start up the
11  program. That's just my interpretation. And that
12  funding was no longer being given at that point. I
13  don't think I answered your question. I didn't
14  understand --
15  Q  You didn't. That's okay. If you don't
16  understand a question, you can tell me.
17  A  Okay.
18  Q  You told me that you stopped doing the
19  reports because the funding stopped, right?
20  A  Right.  Once -- I did the reports up
21  until they were no longer due.
22  Q  That was in December of '12?
23  A  That was around that time.
24  Q  Was the Judicial Diversion Program still
25  active at that time?

1  A  Correct.
2  Q  It was?
3  A  Yes.
4  Q  So you were still assigned to JDP even
5  after you no longer had to prepare the reports?
6  A  Correct. I was informed that I may --
7  they may get funding again.
8  Q  Who told you that the funding had ceased
9  for that program? I mean, for the reports?
10  A  Katie Moran.
11  Q  Did you tell anyone in your bureau that
12  you were no longer required to prepare the reports?
13  A  That I'm not sure of.
14  Q  How many days a week was the JDP?
15  A  It varied. When it first started out, it
16  was more days. Then it went down to one day. And
17  then I would go to regular courtrooms the rest of
18  the time.
19  Q  When did it go down to one day?
20  A  Maybe a year or a year before I left,
21  maybe. I'm not sure exactly when.
22  Q  2011 or 2012?
23  A  2012.
24  Q  Other than JDP, what were your other
25  responsibilities in the Narcotics Bureau?

1  A  I did forged instrument cases.
2  Q  What does that mean?
3  A  I handle cases involving forged
4  prescriptions.
5  Q  When you say "handled," what do you mean?
6  A  Present to the Grand Jury, investigate,
7  get the evidence needed.
8  Q  Did you try cases?
9  A  No.
10  Q  Why not?
11  A  The forged instrument case was the only
12  possibility of having a trial for me because I was
13  in the diversion, so most of my cases people pled
14  guilty to participate in the drug program, it's part
15  of the deal. They plead guilty and...
16  Q  But as far as the forged instrument cases
17  --
18  A  There were no cases that were going to
19  trial.
20  Q  When you are assigned a forged instrument
21  case, who determines whether or not there will be a
22  plea offered in that case?
23  A  It varied. Oftentimes -- it varied.
24  Sometimes it would be me and sometimes it would be
25  Bob or Joe.

1  Q  Who is Joe?
2  A  Joe Carroll.
3  Q  When you say it would be Bob or Joe, how
4  would it be determined who?
5  A  Who is ever available. If I walked in
6  and I saw one that was available, that's who I
7  talked to.
8  Q  So you would consult with them regarding
9  what to do with the case?
10  A  Correct.
11  Q  Did you ever recommend that any of your
12  forged instrument cases go to trial?
13  MR. SOLOTAROFF:  Objection to the form.
14  A  They -- people -- they were on
15  surveillance submitting a forged instrument, so not
16  too many people -- nobody was -- for the cases that
17  I had, no one was interested in a trial. At least
18  the cases that I handled while I was there, the
19  forged instrument cases, people, you know, I speak
20  to the pharmacist and get a description of who --
21  what the person looked like who submitted the
22  document. Nobody -- once I told a defense attorney,
23  nobody was interested in a trial.
24  Q  So they would just plead guilty to the
25  charges?

1    A    Pretty much whatever the offer was, they

2    would plead guilty and, yes, that was it. It wasn't

3    a case where -- yeah, that would be it.

4    Q    Did you ever handle any other cases

5    besides forged instrument cases in the Narcotics

6    Bureau?

7    MR. SOLOTAROFF:    Objection to the form.

8    You can answer if you understand.

9    A    Can you --

10    BY MS. DONNELLY:

11    Q    Other than the forged instrument cases,

12    and we're putting JDP out of it, did you handle any

13    other types of case?

14    A    A few other cases.

15    Q    Such as?

16    A    It would be marijuana, possession of

17    marijuana, heroin maybe, but not too many. Mostly

18    forged instrument.

19    Q    Did you recommend that any of those cases

20    go to trial?

21    MR. SOLOTAROFF:    Objection.

22    A    They -- once -- there was -- I didn't

23    have any cases that -- most of my cases being from

24    JDP, I didn't really have cases that were going to

25    be going to trial. These are cases that people

1    plead guilty to.

2    BY MS. DONNELLY:

3    Q    I'm not talking about the JDP cases, I

4    understand what you're saying in terms of the pleas

5    to those cases. I'm talking about the other cases

6    that you handled while you were in the Narcotics

7    Bureau.

8    A    Yes.

9    Q    If you ever recommended any of those

10    cases, that they go to trial?

11    MR. SOLOTAROFF:    Objection to the form.

12    A    No.

13    BY MS. DONNELLY:

14    Q    While you were in the Narcotics Bureau,

15    what were your hours?

16    MR. SOLOTAROFF:    Objection to the form.

17    You can answer if you understand the

18    question.

19    A    I would say Monday through Friday, 9:00

20    to 5:00 and whatever else time was needed.

21    BY MS. DONNELLY:

22    Q    9:00 to 5:00 were the hours that you were

23    required to be in the office?

24    A    As a general, yeah.

25    Q    When you had JDP, what time did court

1    start?

2    A    10:00.

3    Q    Like with the other bureaus that you ran,

4    were you required to maintain your own time sheets

5    when you were in the Narcotics Bureau?

6    A    Yes.

7    Q    Who did you submit those time sheets to

8    when you were --

9    A    Bob Ewald and Joe Carroll.

10    Q    Again, it was part of your responsibility

11    to make sure those time records were complete and

12    accurate, correct?

13    A    Yes.

14    Q    Did they have a requirement for when the

15    time records were supposed to be submitted?

16    A    That I don't recall. Just in a timely

17    fashion. It was not like a designated time.

18    Q    Was your payroll, your paycheck based

19    upon the time records you submitted?

20    MR. SOLOTAROFF:    Objection.

21    BY MS. DONNELLY:

22    Q    If you know.

23    A    That I don't know.

24    Q    While you were employed in the Narcotics

25    Bureau, did you report to work on time at 9:00?

1    A    In the beginning, yes.

2    Q    And thereafter?

3    A    No, I did not.

4    Q    When did you stop reporting to work on

5    time?

6    A    When I saw that other people were getting

7    in later.

8    Q    What other people did you see getting in

9    later?

10    A    Dina Conjerro, Pam Bloomfield, Andy

11    Heppernin.

12    Q    What year was that?

13    A    From the time I was in Narcotics, like,

14    around 2010, 2011, 2012, all the way up until I was

15    let go.

16    Q    While in the Narcotics Bureau, were you

17    ever assigned to any surveillance responsibilities?

18    A    Surveillance, no, I was not.

19    Q    Were you assigned to any wire taps?

20    A    No, I was not.

21    Q    Did you ever conduct any sort of

22    investigation into any of those?

23    A    No.

24    Q    Do you know whether Andy Heppernin was

25    ever assigned to a wire tap?

1      A    I would assume so, but I don't remember
2  for sure. I would assume so.
3      Q    Do you know what the hours of work are or
4  can be when you are assigned to a wire tap?
5      A    No, I do not.
6      Q    Do you know whether Andy Heppernin was
7  ever assigned to any special projects for the
8  Narcotics Bureau?
9      A    That I do not know.
10     Q    Do you know Cingero -- what that the
11  name?
12     A    Conjerro.
13     Q    Do you know whether Dina was assigned to
14  any wire taps when she was with the Narcotics
15  Bureau?
16     A    That I don't know.
17     Q    Do you know whether she was assigned to
18  any special projects?
19     A    That I don't know.
20     Q    Do you know whether or not she acted as a
21  liaison for the Narcotics Bureau with any other
22  agencies?
23     A    No, I don't know.
24     Q    Do you know whether Pam Bloomfield was
25  ever assigned to any wire taps in the Narcotics

1  Bureau?
2     A    She was not when I was there. I don't
3  know about since.
4     Q    Do you know whether or not she was
5  assigned to any special projects?
6      MR. SOLOTAROFF:  Objection.
7     A    Not that I'm aware of.
8  BY MS. DONNELLY:
9     Q    Do you know whether or not Pam Bloomfield
10  tried any cases while in the Narcotics Bureau?
11     A    Not when I was there.
12     Q    Do you know whether or not any of the
13  three individuals identified by you, had requested
14  permission to report late to work while they were
15  assigned to the Narcotics Bureau?
16     A    No one ever mentioned getting permission
17  to come in late.
18     Q    That wasn't my question. My question
19  was: Do you know whether or not they were granted
20  permission to come in late?
21      MR. SOLOTAROFF:  Objection to the form.
22     A    No, I do not.
23  BY MS. DONNELLY:
24     Q    Did you ever request permission to come
25  in late?

1     A    No, I did not.
2     Q    Did you ever advise either your bureau
3  chief or your deputy bureau chief of the reason for
4  your lateness?
5      MR. SOLOTAROFF:  Objection to the form.
6     A    I'm not sure.
7  BY MS. DONNELLY:
8     Q    Why were you repeatedly late for work
9  when you were in the Narcotics Bureau?
10     A    I was putting my children on the school
11  bus.
12     Q    At the time that you started in the
13  Narcotics Bureau, how old were your children?
14     A    My son -- let's see -- my son was two and
15  my daughter was about seven.
16     Q    Were you putting your son on the school
17  bus at two?
18     A    No. He was -- give me a minute. He was
19  six. He was six. He was six years old.
20     Q    Your son was six in 2009?
21     A    He was born in -- he was born in 2007. I
22  was putting my kids on the school bus when I -- let
23  me just -- I just need a minute. Yeah. He was six.
24     Q    He was six in 2013?
25     A    Correct.

1     Q    You said you stopped coming in on time
2  for work when you saw other people reporting late
3  for work?
4     A    Correct.
5     Q    I asked you why you were late for work,
6  you said because you were putting your kids on the
7  school bus.
8     A    Yeah. My daughter was of age to be on
9  the school bus.
10     Q    But your son, at two, was not going on
11  the school bus?
12     A    No, he was not.
13     Q    Your son, at three, was not going on the
14  school bus?
15     A    Right. It was my daughter who was
16  getting on the school bus.
17     Q    Who was caring for your son while you
18  were working?
19     A    He went to the day care center. He went
20  to a day care center at the court house, at some
21  point. The Cole Hallen Kids Daycare Center and then
22  he went to Stony Brook Daycare Center. And then I
23  had a family member taking care of him.
24     Q    So when he was two, he went to the Cole
25  Hallen --

1    A    Yes.
2    Q    -- Daycare Center, which is attached to
3    your work?
4    A    Right.
5    Q    So you would drop him off before you went
6    to work?
7    A    Correct.
8    Q    What time did your daughter get the
9    school bus?
10    A    It was 5 to 9.
11    Q    At the time you were reporting on time
12    for work, who was putting your daughter on the
13    school bus?
14    A    A neighbor.
15    Q    Did you ever request permission from your
16    bureau chief or your deputy bureau chief to be late
17    for work so you could put your children on the
18    school bus?
19    A    I did not. Other people were coming in
20    at that time.
21    Q    So since other people were doing it, you
22    thought it was okay for you to?
23    A    It seemed like it was.
24    Q    You just acknowledged, however, that you
25    don't know whether there were other situations going

1    on with the people you identified, correct?
2        MR. SOLOTAROFF:   Objection to the form.
3    A    Not the entire time. Even if they did a
4    wire tap, it's not for four years.
5    BY MS. DONNELLY:
6    Q    So you're saying those people came in
7    late all the time for four years?
8    A    Correct.
9    Q    If their time records reflect
10    differently, you would be mistaken?
11        MR. SOLOTAROFF:   Objection to the form.
12    A    I'm just saying for the time that I've
13    seen them, they were not -- they were coming in
14    around the same time as me.
15    BY MS. DONNELLY:
16    Q    And I'm saying if their time records
17    reflect differently, then you would be mistaken,
18    correct?
19        MR. SOLOTAROFF:   Objection to the form.
20    A    Right. I'm just saying what I saw and
21    what time they were coming in.
22    BY MS. DONNELLY:
23    Q    If the time records show that they
24    consistently came in before you, then you could not
25    have witnessed what time they were getting there,

1    correct?
2        MR. SOLOTAROFF:   Objection to the form.
3    A    There were times when I would come in
4    before them, so I know who's coming in around what
5    time.
6    BY MS. DONNELLY:
7    Q    There --
8    A    I'm not always the last person to come
9    in. I see who is coming in, what time they're
10    coming in. That's how I know who is coming in at
11    what time.
12    Q    So you are talking about people who
13    always came in after you?
14        MR. SOLOTAROFF:   Objection to the form.
15    A    I can't say they'd always come in after
16    me.
17    BY MS. DONNELLY:
18    Q    But you're saying that's how you know
19    they were late because they always came in after --
20        MR. SOLOTAROFF:   She didn't say "always."
21    A    I didn't say that.
22    BY MS. DONNELLY:
23    Q    People who occasionally got there after
24    you --
25        MR. SOLOTAROFF:   Objection to the form.

1        You want to just let her testify or do
2    you want to testify, Mary Ellen?
3        Is there a question pending?
4    BY MS. DONNELLY:
5    Q    People that occasionally came in after
6    you, that's what you judged your statement on?
7        MR. SOLOTAROFF:   Objection to the form.
8    A    I can't say occasionally, label it as
9    that. I'm just saying that I witnessed people
10    coming in late and it seemed like it was okay.
11    BY MS. DONNELLY:
12    Q    You witnessed people coming in late after
13    your arrival?
14    A    Correct.
15    Q    And you witnessed people coming in late
16    consistently after your arrival --
17        MR. SOLOTAROFF:   Objection to the form.
18    BY MS. DONNELLY:
19    Q    -- is that correct?
20    A    Can I say, they were -- they were coming
21    in late. People are looking for them. People are
22    going up and down the hallway, are they coming in,
23    are they not coming in, they don't know. Yes, I
24    witnessed people coming in late.
25    Q    On a regular basis?

1         MR. SOLOTAROFF:  Objection to the form.
2         A    Yeah.  I would say pretty often.  I would
3    say regular basis.  I wasn't keeping track of them
4    like that, but I would say often, quite a few times.
5    I can't answer it any more than that.  That's what I
6    know.
7    BY MS. DONNELLY:
8         Q    So it was based on that that you made the
9    decision to come in late?
10        A    Yeah, because other people were coming
11   in.
12        Q    And I'm saying, if their time records
13   show differently, then you would be mistaken,
14   correct?
15        MR. SOLOTAROFF:  Objection to the form.
16        A    I'm not mistaken as to what I saw, so I
17   don't understand.
18   BY MS. DONNELLY:
19        Q    Well, you had a card that you had to use,
20   or most people had to use, to access the building,
21   correct?
22        MR. SOLOTAROFF:  Objection to the form.
23        A    Correct.
24   BY MS. DONNELLY:
25        Q    If their time card shows their entry to

1    the building to be before you, you could not have
2    witnessed them coming in late, correct?
3         MR. SOLOTAROFF:  Objection to the form.
4    BY MS. DONNELLY:
5         Q    Just answer my question.
6         A    Yeah, on that particular day.  But there
7    were a lot of times when I was in before these other
8    people and I saw when they got in.
9         Q    If the time records --
10        A    That's all I'm saying.
11        Q    -- show that your statement that you just
12   made is not true, then you're mistaken, correct?
13        MR. SOLOTAROFF:  Objection to the form.
14        A    I don't think you're understanding what
15   I'm saying.
16   BY MS. DONNELLY:
17        Q    I don't think you're understanding what
18   I'm saying.
19        MR. SOLOTAROFF:  That's right, because
20   you're not understanding that she's trying to trap
21   you into an answer, that's what you are not
22   understanding.  It's a ridiculous question.
23        Are we talking about every single day?
24        MS. DONNELLY:  Stop with the speaking
25   objections.

1         MR. SOLOTAROFF:  Stop with the ridiculous
2    questions.
3         MS. DONNELLY:  Object and stop with the
4    speaking objections.
5         MR. SOLOTAROFF:  Stop with the ridiculous
6    questions.  Look, we can really call the judge about
7    this.  If you really think that you can --
8         MS. DONNELLY:  I'm happy to call the
9    judge about this.
10        MR. SOLOTAROFF:  Call her.  Do you really
11   think that you can --
12        MS. DONNELLY:  I'm not going to waste my
13   time in my deposition, so I'm going to ask my
14   questions.
15   BY MS. DONNELLY:
16        Q    You were late from 2011 until you were
17   separated from your employment in 2013, correct?
18        MR. SOLOTAROFF:  Objection.
19        Every single day?
20   BY MS. DONNELLY:
21        Q    Pretty much every single day.
22        A    I can't say that's true.
23        Q    Have you reviewed the time records
24   produced --
25        A    That doesn't have every single day that I

1    came in.
2         Q    Answer my question.  Let me ask my
3    question.  Have you reviewed the time records
4    produced in this case?
5         A    Yes, I have.
6         Q    Were there any days that you found that
7    you reported for work on time?
8         A    The days that I reported for work on
9    time, I walked in with other people, so I didn't use
10   my access card.  I just walked in with other people,
11   so that is not reported.
12        Q    So you're saying on the days where there
13   was no swipe for you, you walked in with somebody
14   else?
15        A    Yes.
16        MR. SOLOTAROFF:  Objection. Objection.
17   Objection.
18        Q    Every time --
19        A    I'm not saying every time, but there were
20   many times.  That is not a clear and accurate of
21   every time I entered the building.
22        Q    So was it always you that someone else
23   held the door for?
24        A    People hold the door for the person who
25   is standing behind them; it's common courtesy

1      A     Did I ever? That I don't know.

2      Q     Well, for at least the beginning of the

3 time period that you were in the Narcotics Bureau,

4 you didn't even have an access card; is that

5 correct?

6      A     Yes, that is probably true.

7      Q     And you had to request a new one?

8      A     Correct.

9      Q     Do you recall when that was?

10     A     No idea.

11     Q     Now, at any --

12     A     Maybe 2012, I'm not sure. 2011, 2000 --

13 I don't --

14     Q     In the beginning you didn't have it?

15     A     Right.

16     Q     So the beginning is not 2012.

17     A     2011. No. I'm sorry.

18         MR. SOLOTAROFF: Don't guess. Do not

19 guess.

20     A     I don't know.

21 BY MS. DONNELLY:

22     Q     When did you start in the Narcotics

23 Bureau?

24     A     2009.

25     Q     Now, at any time during your tenure with

1 the Narcotics Bureau, were you counseled for being

2 late?

3     A     Yes.

4     Q     How many times?

5     A     Twice.

6     Q     Who counseled you?

7     A     Bob sent an e-mail to the bureau. I

8 believe it was Bob, it was, like, a general e-mail

9 to everybody to try to be on time.

10     Q     I'm talking about you specifically?

11     A     Once.

12     Q     When?

13     A     In March of 2013.

14     Q     Prior to March of 2013, nobody ever told

15 you that you needed to report on time?

16     A     Yes. We got e-mails to please try to be

17 on time.

18     Q     My mistake. You specifically?

19     A     I don't recall, but I know that there was

20 a general e-mail that you -- everybody try to be on

21 time. I may have gotten one specifically too, but

22 it was -- the last one was, like, general, like,

23 everyone, you know, people are coming in late, kind

24 of thing. Please, everybody try to be on time.

25     Q     Do you recall receiving an e-mail in 2011

1 from Bob Ewald requesting that you be on time? You,

2 not a group e-mail, you.

3     A     That's -- that's probably true.

4     Q     In response to that e-mail, were you on

5 time?

6     A     In response to --

7         MR. SOLOTAROFF: Objection.

8 BY MS. DONNELLY:

9     Q     Once you got the e-mail asking that you

10 report to work on time, did you report to work on

11 time?

12         MR. SOLOTAROFF: Objection.

13     A     I'm not sure.

14 BY MS. DONNELLY:

15     Q     In March of '13, you said you were

16 counseled about your timeliness?

17     A     Yes.

18     Q     After you were counseled about your

19 timeliness in March '13, did you report to work on

20 time?

21         MR. SOLOTAROFF: Objection.

22         You can answer if you understand what

23 she's asking.

24     A     No I did not.

25

1 BY MS. DONNELLY:

2     Q     Why not?

3     A     On Fridays we're -- he's, like, drinking

4 beer.

5     Q     At 9:00 in the morning?

6     A     No. On Fridays in the afternoon.

7     Q     I'm asking if after you were counseled in

8 March of 2013, you reported to work on time. You

9 said no.

10     A     No.

11     Q     I said why not?

12     A     Other people were still coming in late.

13     Q     Were you ever counseled about not

14 submitting your time sheets in a timely fashion?

15     A     No, not from Bob Ewald.

16     Q     I didn't say Bob Ewald. I said were you

17 ever counseled about not submitting your time

18 sheets?

19     A     I think --

20         MR. SOLOTAROFF: Objection.

21     A     I think Elaine said to submit them on

22 time, somebody said to submit them on time. And

23 then there was -- like, everybody -- several people

24 didn't submit their time sheets on time. People

25 would have, like, months piled up and then they were

1  filling them out. And so then he said that you have
2  to start sending them in on time.
3  BY MS. DONNELLY:
4      Q     On how many occasions were you counseled
5  regarding your time sheets?
6          MR. SOLOTAROFF:   Objection to the form.
7      A     Other people, it was just a general
8  e-mail to the bureau, to everybody to please submit
9  your time sheets on time.
10 BY MS. DONNELLY:
11     Q     Were you ever counseled regarding failure
12 to submit your financial disclosure statement on
13 time?
14         MR. SOLOTAROFF:   Objection to the form.
15     A     No. It was more like, did you submit it.
16 And I said, it's on your desk.
17 BY MS. DONNELLY:
18     Q     You had a habit of being habitually late
19 with a lot of your responsibilities in the Narcotics
20 Bureau, didn't you?
21         MR. SOLOTAROFF:   Objection to the form.
22         You can answer that question. Go ahead.
23     A     With what responsibilities?
24 BY MS. DONNELLY:
25     Q     Doing your time sheets, reporting to work

1  on time, submitting financial disclosure statements?
2      A     There was one e-mail from Ed Heilig that
3  said 90 -- only 90 people turned in their financial
4  disclosure and it was due the next day. I mean, I
5  was along with a lot of other people who didn't turn
6  it in. And the office didn't -- the whole office
7  was late turning it in that year, the entire office.
8      Q     So --
9      A     They held onto it.
10     Q     So from what I'm hearing from you, your
11 attitude was, if everybody else is doing it, so can
12 I, correct?
13         MR. SOLOTAROFF:   Objection to the form.
14         What Miss Donnelly is hearing is not
15     relevant to the case.
16 BY MS. DONNELLY:
17     Q     Is that correct?
18     A     No, that's not what I'm saying.
19     Q     Okay.
20         MS. DONNELLY:   Can you mark that?
21         (Bates D 1601 is received and marked
22 Defendant Exhibit D-9 for identification.)
23         (Time noted:  3:40 p.m.)
24 BY MS. DONNELLY:
25     Q     Have you seen this e-mail before?

1      A     Yes.
2      Q     It was an e-mail from Elaine Reffelt to
3  you and others, dated September 9, 2003, correct?
4      A     Yes.
5      Q     You had been employed for approximately a
6  month at that time, correct?
7      A     Yes.
8      Q     "Just a reminder for you to file your
9  financial disclosure statement and send me the
10 receipt indicating that you have filed." Okay. Was
11 that something that was requested that you do at the
12 time of your hire?
13     A     No. I don't -- let's see. It looks like
14 it, yes.
15     Q     You, in fact, did not file your financial
16 disclosure statement until a month later on
17 October 9, 2003, correct?
18     A     I don't know -- can you ask the question
19 again?
20     Q     You didn't file your --
21     A     No. The question prior to that.
22     Q     Was this something that you were required
23 to do at the time of your hire?
24     A     That I'm not sure of.
25     Q     But you did get an e-mail reminding you

1  to do it?
2      A     Correct.
3      Q     So someone must have asked you before
4  September 9, 2003, to do it, correct?
5      A     Correct.
6          MR. SOLOTAROFF:   Objection.
7  BY MS. DONNELLY:
8      Q     And you did not, in fact, do it until
9  October 9, 2003, correct?
10     A     Correct.
11         MR. SOLOTAROFF:   Objection.
12 BY MS. DONNELLY:
13     Q     So it wasn't until a month after you
14 received the reminder that you filed the statement,
15 correct?
16         MR. SOLOTAROFF:   Objection.
17     A     But I don't know when it was due based on
18 this e-mail.
19 BY MS. DONNELLY:
20     Q     It wasn't until a month after you
21 received the reminder e-mail that you filed the
22 statement, correct?
23         MR. SOLOTAROFF:   Objection.
24     A     Yes.
25

1    A    Yes.

2    (Bates D 233-235 is received and marked

3  Defendant Exhibit D-17 for identification.)

4  BY MS. DONNELLY:

5    Q    Have you seen that document before?

6    A    Yes.

7    Q    This is notification to you from Elaine

8  Reffelt in April 20th of 2010 advising you that your

9  driver's license had expired; is that correct?

10    A    Correct.

11    Q    And it is part of the requirements of

12  your position as an ADA that you maintain a current,

13  valid license, correct?

14    A    Correct.

15    Q    And you had let your license expire,

16  correct?

17    A    As soon as I got this I took care of it.

18    Q    But at the time you got this, your

19  license was expired, correct?

20    A    Yes.

21    (Bates D 223 is received and marked

22  Defendant Exhibit D-18 for identification.)

23  BY MS. DONNELLY:

24    Q    Have you seen that document before?

25    A    Yes.

1    Q    This is another letter from

2  administration dated April 30, 2012, again

3  requesting that you sign time sheets; is that

4  correct?

5    A    That's correct.

6    Q    And did you take care of that?

7    A    I did.

8    (Bates D 1605 is received and marked

9  Defendant Exhibit D-19 for identification.)

10  BY MS. DONNELLY:

11    Q    With respect to the financial disclosure

12  form that you did submit on July 5, 2012, are you

13  aware that you were the last ADA in the District

14  Attorney's office to submit that financial

15  disclosure form?

16    A    I wouldn't know that.

17    Q    Have you seen this document before?

18    A    Yes.

19    Q    This is an e-mail from Bob Ewald

20  regarding missing timing sheets, correct?

21    A    Yes.

22    Q    And it states in this e-mail that you had

23  received an e-mail and then spoke with Doreen

24  regarding your late time sheets; is that correct?

25    A    Correct.

1    Q    And that she still had not received them

2  as of May 6, 2013. Were you late with your time

3  sheets in May of 2013?

4    A    Yes.

5    Q    Was the timely submission of time sheets

6  required in order for you to get paid?

7    MR. SOLOTAROFF:  Objection.

8    A    I don't know.

9  BY MS. DONNELLY:

10    Q    Now, you started in the Narcotics Bureau

11  in October of 2009; is that correct?

12    A    I started in 2009, I don't know the

13  effective date.

14    (Bates D 004 is received and marked

15  Defendant Exhibit D-20 for identification.)

16  BY MS. DONNELLY:

17    Q    Have you seen that document before?

18    A    Yes.

19    Q    When was your transfer to the Narcotics

20  Bureau effective?

21    A    October 19, 2009.

22    Q    So you transferred to the Narcotics

23  Bureau in October 19, 2009, correct?

24    A    Correct.

25    (Bates D 515 is received and marked

1  Defendant Exhibit D-21 for identification.)

2  BY MS. DONNELLY:

3    Q    Have you seen that e-mail before?

4    A    Yes.

5    Q    So on November 20, 2009, you sent an

6  e-mail to Joe Carroll requesting to come in late on

7  Monday, November 23rd, to have off the day after

8  Thanksgiving and have the week after Christmas off,

9  correct?

10    A    Correct.

11    Q    At the time that you made this request,

12  you had been in the bureau for a month, correct?

13    A    It says October 2009, yes.

14    Q    Right.  You started in October 2009?

15    A    Yes.

16    Q    You are requesting time off in November

17  of 2009.  Okay?

18    A    Correct.

19    Q    Correct?

20    A    Yes, for scheduling purposes.

21    Q    Do you think that was the best way to

22  make a good first impression on your bureau chief?

23    MR. SOLOTAROFF:  Oh, please. Objection.

24    A    I don't know.  Asking for Christmas week

25  off?

1    Q    And what position did Pat Gunn hold?
2    A    He was an ADA in the bureau.
3    Q    Who did you report this comment to?
4    A    They were all there laughing. Who --
5  just -- no. I was --
6    Q    Was Bob Ewald there?
7    A    He may not have been there that day. I
8  am not sure.
9    Q    Was Joe Carroll there?
10    A    No. I don't --
11    Q    Did you report that comment to him?
12    A    No.
13    Q    Was Emily Constant present?
14    A    She was not.
15    Q    Did you report that comment to her?
16    A    No.
17    Q    Was Ed Heilig present?
18    A    No.
19    Q    Did you report that comment to him?
20    A    No.
21    Q    Was the DA present?
22    A    No.
23    Q    Did you report that comment to him?
24    A    No, I did not.
25    Q    Did you say anything to Pat Gunn when he

1  made that comment?
2    A    No. I was hoping it was an isolated
3  incident. I thought it's just going to end there.
4    Q    Did any of the females present in the
5  room say anything?
6    A    No.
7         MR. SOLOTAROFF:  Objection.
8  BY MS. DONNELLY:
9    Q    When was the next incident?
10    A    Well, there was several after that. John
11  always made fun of me. I wasn't allowed --
12    Q    We are going to take them one at a time.
13  Okay?
14    A    Okay.
15    Q    When was the next incident that you
16  recall after the dip?
17    A    I'm not going to be able to say in
18  chronological order, but I'll just tell you that
19  John, one instance -- not one, but several times,
20  all the time --everybody could read the newspaper.
21  He would get -- subscribe to a newspaper and
22  everybody at the table could read it, and I wasn't
23  allowed to even touch his paper. Went I get in in
24  the morning --
25    Q    Hold on.

1    A    Okay. So that --
2         MR. SOLOTAROFF:  Wait. No, no, no, no.
3         THE WITNESS:  I'm sorry.
4         MR. SOLOTAROFF:  Remember what I said.
5  BY MS. DONNELLY:
6    Q    Where was the newspaper kept?
7    A    In the lunchroom, in the conference room.
8    Q    On what do you base your statement that
9  you were not allowed to touch it?
10    A    He told everybody at the table. Anybody
11  could look at this paper, but Avemaria. He made it
12  very clear. I was like the butt of the jokes.
13    Q    When did this occur?
14    A    Several times.
15    Q    What year?
16    A    2012.
17    Q    You said this occurred in the morning?
18    A    I didn't say that it occurred in the
19  morning, at lunch time.
20    Q    Did you eat with everybody at lunch time?
21    A    I tried to, no matter how much they
22  insulted me.
23    Q    Who was present when he said this?
24    A    It's the usual. I would say Jake, Pam,
25  or Beth, probably Beth, Ryan were present.

1    Q    Did you report this to anybody?
2    A    No.
3    Q    Did you say anything to John Scarlatto?
4    A    He is very good friends with Bob. It
5  took a long time before I could actually even tell
6  him to please stop bothering me.
7    Q    Did you tell him that?
8    A    I did.
9    Q    What happened as a result of you telling
10  him that?
11    A    Then he didn't talk to me as much
12  anymore.
13    Q    Did he stop teasing you?
14    A    He did, but I still wasn't allowed to
15  read his paper.
16    Q    Did you ever speak to Bob about it?
17    A    That's his good friends. They have
18  coffee every morning.
19    Q    That wasn't my question. My question was
20  --
21    A    No.
22    Q    -- if you ever spoke to him about it?
23    A    No.
24    Q    Did you ever speak to Joe Carroll about
25  it?

1          MR. SOLOTAROFF: Hold on, Mary Ellen.
2     A   No.
3  BY MS. DONNELLY:
4     Q   What was the next event that you
5  remember?
6     A   John hiding the key from me for about a
7  year. Every morning I'd come in, I'd have to walk
8  around the bureau, looking for the key. Did anybody
9  see the key. Sometimes I'd have to ask admin to let
10  me into the office. I just have to leave my things
11  in other people's offices because of the fact that
12  John would hide the key. And I learned he was
13  hiding the key at a luncheon when we were -- we had
14  a lunch -- we all went to lunch for the intern that
15  was leaving, and one of the secretaries said that --
16  how she opens up all the doors every morning and
17  John closes my door and hides the key. And then
18  during the holiday, Christmas holiday, John wrote a
19  poem making fun of that particular secretary having
20  a big mouth, talking about him hiding the key.
21     Q   First -- let's take this in pieces.
22  First you claimed that John would shut your door
23  every morning?
24     A   Correct.
25     Q   After it was opened and hide the key?

1     A   Correct.
2     Q   You earlier testified that John would
3  come in after you in the morning.
4     A   No. I never said when he came in. I
5  never said when John came in.
6     Q   You said he was one of the people you
7  witnessed coming in late.
8     A   No, I did not.
9     Q   Okay. The record will speak for itself.
10     A   Yes.
11          MR. SOLOTAROFF: Certainly will.
12  BY MS. DONNELLY:
13     Q   So john was always there before you,
14  then?
15     A   Correct.
16     Q   And the secretaries opened up the door at
17  what time?
18     A   That I don't know.
19     Q   Because you weren't there, correct?
20     A   Right. I don't know what time.
21     Q   And the secretaries were the ones that
22  had the keys to the door, correct?
23     A   No. It was kept in a location for
24  everybody in the bureau to access.
25     Q   Where was it kept?

1     A   In an office that was like a file room.
2     Q   Where in there?
3     A   In a drawer.
4     Q   in the file room drawer?
5     A   Yeah.
6     Q   So since you were not in the office on
7  time when the doors were opened, John would close
8  your door, correct?
9          MR. SOLOTAROFF: Objection. Objection.
10  BY MS. DONNELLY:
11     Q   Did you complain to anybody about that?
12     A   Yeah, the people who I was friends with.
13     Q   Who were you friends with?
14     A   At the time, Ryan and Pam. And just --
15  yeah, at least definitely Ryan and Pam about how
16  he -- what he was doing, because when I would come
17  in he would be laughing at me. It was just weird
18  and creepy.
19     Q   After you told John that his behavior
20  bothered you, did that stop?
21     A   Then he finally stopped.
22     Q   What was John's position in the bureau?
23     A   He was an ADA.
24     Q   Did you tell Bob Ewald about John's
25  behavior?

1     A   No, I did not.
2     Q   Did you tell Joe Carroll about Joe's --
3     A   Everybody knew.
4     Q   Not my question.
5          MR. SOLOTAROFF: Right.
6     A   No.
7  BY MS. DONNELLY:
8     Q   Did you tell Emily Constant about John's
9  behavior?
10     A   No.
11     Q   Did you tell Ed Heilig about John's
12  behavior?
13     A   No, I did not.
14     Q   Did you tell the DA about John's
15  behavior?
16     A   No.
17     Q   When did it stop?
18     A   When I finally had the courage to write
19  him an e-mail and tell him to please stop bothering
20  me.
21     Q   So you didn't speak to him in person, you
22  wrote him an e-mail?
23     A   Yeah, I told him in person several times
24  to please stop bothering me and it was, like, a big
25  joke. And he wouldn't leave me alone, so finally I

1   had to send an e-mail.

2   Q   Do you recall when you sent that?

3   A   No.

4   (Bates D 1595 is received and marked

5   Defendant Exhibit D-22 for identification.)

6   BY MS. DONNELLY:

7   Q   Have you seen that e-mail before?

8   A   Yes.

9   Q   Is that the e-mail that you're referring

10   to?

11   A   Yes.

12   Q   And that's dated January 26, 2012,

13   correct?

14   A   Yes.

15   Q   After you sent that e-mail in January 26

16   of 2012, the behavior stopped?

17   A   Yes.

18   Q   Thank you. Tell me the next event.

19   A   The next event was -- what else happened?

20   I was -- there's so many things. Let's see. Bob

21   asked me to recite that poem. Everybody told me

22   that when you get to this bureau, you have to recite

23   this dirty poem. Beth looked up the poem for me and

24   she said that this is the poem you are supposed to

25   read. And John explained how it's supposed to be

1   read in a funny manner, like a Saturday Night Live

2   kind of skit and he was the best person to read it

3   so far. And so the mumbles on Friday between 3:00

4   and 5:00, Bob asked me to read the raunchy poem and

5   I said I wouldn't read it.

6   Q   What was the name of the poem?

7   A   I don't know the name of it, but it's one

8   line -- one particular line in the poem was about

9   Abraham Lincoln sexual position -- about Abraham

10   Lincoln oral sex. So each line had a different

11   sexual position.

12   Q   But you don't know the name of the poem?

13   A   No.

14   Q   Did you see the poem?

15   A   Yes, when Beth looked it up.

16   Q   What's Beth's last name?

17   A   Crayton.

18   Q   And Beth was already in the bureau at

19   that time?

20   A   Yes.

21   Q   Did Beth read the poem?

22   A   Yes. Well, I assume so because they said

23   the last to arrive always reads the poem at the

24   Christmas party.

25   Q   So this was a Christmas party that it was

1   to be read?

2   A   Correct.

3   Q   When was the Christmas party?

4   A   The Christmas party would be that year.

5   Q   What year?

6   A   It was probably after -- I would say when

7   I first got there in 2010.

8   Q   You're saying that it was in December of

9   2009?

10   A   2009 around. Either that December or the

11   2010 December, but for that holiday party.

12   Q   Was there anyone new in the department

13   between 2009 and 2010, December?

14   A   That I don't know.

15   Q   That would have been the last person to

16   arrive in the department, correct?

17   A   Yeah. I don't remember. I know they

18   spoke to Robbie Kerr about reading it.

19   Q   Who is Rob Kerr?

20   A   He's another ADA in the bureau.

21   Q   When was he in the bureau?

22   A   He was in the bureau -- he got there

23   after me.

24   Q   Do you remember when?

25   A   He probably got there around 2010, 2011.

1   Q   2010, 2011?

2   A   Yes.

3   Q   So if it was in 2010, he would have been

4   the one to read the poem?

5   A   Right. They were talking to both of us.

6   John was talking to -- John and Jake were talking to

7   both of us about reading the poem and Beth had

8   looked it up for me. And Bob was asking me to,

9   during mumbles, if I would read it.

10   Q   So this was in 2010?

11   A   Approximately.

12   Q   When was the Christmas party in 2010?

13   A   It's usually around the holidays.

14   Q   Where was it?

15   A   Where was what?

16   Q   The Christmas party.

17   A   While I was there, the Christmas parties

18   were at different restaurants, in different places.

19   Q   In 2010 where was it?

20   A   I don't recall. It was at a restaurant/

21   bar.

22   Q   Was it before or after Christmas?

23   A   What was before or after Christmas?

24   Q   The Christmas party, the holiday party?

25   A   Usually they were typically before the

1 holiday.
2                    (Discussion off the record at 4:29 p.m.)
3                    (Testimony read back at 4:47 p.m.)
4 BY MS. DONNELLY:
5       Q      So sometime between Thanksgiving and
6 Christmas in 2010 --
7       A      Yes.
8       Q      -- was when you were asked to read the
9 poem?
10      A      Correct.
11      Q      And you're sure --
12      A      It could have been a little before
13 Thanksgiving, but I would say in the fall -- between
14 the fall of -- between the fall of -- around 2010,
15 2009, 2010. It's either fall, either the fall of
16 2009 or 2010.
17      Q      Well, you weren't there in the fall. You
18 just got there in the fall --
19      A      I just got there in the fall.
20      Q      -- of 2009. And you don't remember the
21 name of the poem?
22      A      No.
23      Q      And you did not read the poem?
24      A      No, I did not.
25      Q      Did anyone read the poem that year?

1       A      No, not that year.
2       Q      Did anyone read the poem in any other
3 years that you were in the bureau?
4       A      Well, they read it, but they just didn't
5 read it to the Christmas party like they said they
6 used to do as a tradition.
7       Q      Did anyone read the poem at the Christmas
8 party while you were in the Narcotics Bureau?
9       A      No.
10      Q      Did you report to anybody about the
11 request that you read the poem?
12      A      No.
13      Q      But you did tell Bob Ewald you would not
14 read the poem?
15      A      Correct.
16      Q      After you refused to read the poem, he
17 still continued to grant your request for time off,
18 correct?
19      A      Yes.
20      Q      And he still continued to grant your
21 requests for training or CLE programs?
22      A      Not every request that I made for CLE
23 program I received.
24      Q      No? What ones were denied?
25      A      I don't know. Occasionally, some -- it's

1 hit or miss. Some you were approved, some you were
2 not.
3       Q      And you're saying he didn't approve some
4 of your requests?
5       A      Sometimes if several people are going,
6 some requests were denied.
7       Q      I just wanted to go back for one second
8 about your door being closed in the morning --
9       A      Yes.
10      Q      -- to make sure that I have your
11 testimony correct. And you claim it was John
12 Scarlatto who was locking your door?
13      A      Correct.
14      Q      And that's because the secretary told you
15 it was him?
16      A      Yeah. She said it in front of everybody
17 at lunch and he started laughing and yelling across
18 the table, admitting that he did it and was telling
19 her she has a big mouth.
20      Q      And when you asked him to stop in the
21 e-mail, he stopped?
22      A      That's when he finally stopped.
23      Q      And do you know whether or not he ever
24 did that to anybody else?
25      A      I've never seen him do that to anybody

1 else.
2       Q      Wasn't my question. Do you know whether
3 or not he did that to anybody else?
4       A      I don't know because I've never seen that
5 done, but to me.
6       Q      Why do you think that him locking your
7 door had to do with your race?
8       A      I'm the only -- only black woman there at
9 the time that he was bothering me. It was pretty
10 obvious.
11      Q      You were the only black woman employed at
12 the Narcotic Bureau at the time?
13      A      During the -- initially, yes. It wasn't
14 until long after that that another black woman came.
15 But at the time when he was at the height of
16 harassing me, I was the only black woman there.
17      Q      Who were the other black women that
18 worked in the Narcotics Bureau?
19      A      There's only one other black woman.
20      Q      Who?
21      A      Tanya Coleman.
22      Q      When did she arrive in the bureau?
23      A      She arrived, like, a few months before I
24 was fired.
25      Q      Are you sure about that?

1   A   Yeah.  I know she was there for the
2   Christmas party, so maybe a year before,
3   approximately a year before.
4       Q   Tanya Coleman?
5       A   Yes.
6           (Discussion off the record.)
7   BY MS. DONNELLY:
8       Q   So would it sound right to you if I said
9   that Tanya Coleman started in the department around
10  October of 2012?
11      A   Yeah, that sounds about right.  That's
12  what I said.
13      Q   Did you see John Scarlatto ever shut her
14  door and hide the key?
15      A   Never.
16      Q   Were there any --
17      A   She shared an office with somebody.
18      Q   Were there any African American males
19  employed in the department at that time?
20      A   Yes.  There was one African American
21  male.
22      Q   Who was that?
23      A   Ryan Hunter.
24      Q   Did John Scarlatto shut his door and lock
25  his door?

1   he was having.  That was a big joke for a while
2   there, about a Jamaican nurse, I believe, he said,
3   kept talking about doing it.
4       Q   Who kept talking about it?
5       A   Bob.  That was like a joke.
6       Q   Bob who?
7       A   Ewald.  That was a joke for a while there
8   about the shaving.
9       Q   When did this occur?
10      A   After Robbie had his procedure.
11      Q   What year?
12      A   2012.  2012, 2013, around about that
13  time.
14      Q   When in 2012?
15      A   I know during the summer, I believe.
16      Q   After you returned from your broken
17  ankle?
18      A   Correct.  It's around that time.
19      Q   Did you take any vacation in the summer
20  of 2012?
21      A   No, I did not.  I asked for time, but
22  didn't take it because I broke my ankle.
23          (Bates D 479 is received and marked
24  Defendant Exhibit D-23 for identification.)
25

1       A   No.  John just --
2       Q   You also stated the comment about the
3   dip?
4       A   Correct.
5       Q   Why do you believe that was based on your
6   race?
7       A   He didn't treat the other women like
8   that, talk to them that way.
9       Q   Well, based upon what you told me, there
10  was one other woman present at that time?
11      A   Yeah, but it was directed at me.  I am
12  the one who brought in the dip from the Stop & Shop.
13      Q   So why do you believe that comment was
14  based on your race?
15      A   Because I was the only African American
16  woman there.  I bring in the dip and it's referred
17  to in such a derogatory term.  I mean, it's...
18      Q   And, again, with the reading of the poem,
19  why do you feel that was based upon your race?
20      A   That was more sexual harassment, more
21  than race.  Everybody was asked to read the poem.  I
22  was offended by it.
23      Q   What else?
24      A   Let's see.  Bob was always talking about
25  Rob Kerr getting his balls shaved for some procedure

1   BY MS. DONNELLY:
2       Q   Have you seen that document before?
3       A   Yes.
4       Q   This was a request for time off in August
5   of 2012, correct?
6       A   Correct.
7       Q   And the request was submitted in
8   July 2012 after you returned from your leave of
9   absence for your broken foot, correct?
10      A   Right.
11      Q   Did you take that time off?
12      A   I don't believe I did.  I know I had
13  asked for time and I didn't take off because of my
14  foot.
15      Q   If your time sheets reflected that you
16  took that time off, would your time sheets be
17  accurate?
18      A   I don't believe I -- honestly, from what
19  I recall, I remember I wanted to do something, but I
20  couldn't because of my foot.
21      Q   It wasn't my question.
22      A   If my time sheet reflects -- I don't -- I
23  think my time sheets will show that I went to work.
24  July 30th, August 3, I really don't...
25          (Time Records are received and marked

1    Defendant Exhibit D-24 for identification.)
2    BY MS. DONNELLY:
3        Q    Does this reflect that you took time off?
4        A    Yes, it does.
5        Q    Thank you.
6             And why do you believe that those
7    statements made by Rob Kerr were based upon your
8    race?
9        A    Those were -- I didn't say that Rob Kerr
10   talking about that was necessarily based upon my
11   race. I said it was more sexual.
12       Q    Okay. Are you aware that the claims in
13   your Complaint were for race discrimination and
14   retaliation based upon complaints of race
15   discrimination?
16       A    Correct.
17       Q    So this may have been my fault, but when
18   I'm asking about examples of discrimination, I am
19   asking about examples of discrimination based upon
20   your race, which are the only claims that are in
21   your Complaint.
22       A    Okay. I can tell you about that. I was
23   called -- you didn't say that before. I was called
24   a monkey by Kate Wagner.
25       Q    Okay. Let's talk about that.

1        A    Okay.
2        Q    You were called a monkey by Kate Wagner?
3        A    Monkey in a suit. You're a monkey in a
4    suit.
5        Q    In what context did Kate Wagner say that
6    you were a monkey in a suit?
7        A    She was talking about a case and coverage
8    of a case and she was yelling and she was -- one
9    thing she was yelling was, "You are a monkey in a
10   suit."
11       Q    When did this occur?
12       A    Around February, I believe.
13            (Bates D 500 is received and marked
14   Defendant Exhibit D-25 for identification.)
15            MS. DONNELLY:    Just note that he directed
16   her attention to the specific allegations in the
17   Complaint.
18            MR. SOLOTAROFF:    Please direct that --
19   mark that, and say it's absolutely okay. That's
20   ridiculous.
21   BY MS. DONNELLY:
22       Q    Is that the comment that you're referring
23   to?
24       A    Correct.
25       Q    Now, when she said you're a monkey in a

1    suit, actually you say, offended by your monkey in a
2    suit comment?
3        A    Right.
4        Q    Was she upset over something that had
5    occurred in the workplace?
6        A    Yes.
7        Q    What had happened?
8        A    She wanted me to cover a particular case
9    for her and I tried to on several occasions, and the
10   judge wanted to speak to her and I asked her to come
11   to court and then she started yelling at me, "You
12   are a monkey in a suit."
13       Q    So she had asked that you cover for her
14   in a certain courtroom?
15       A    Correct.
16       Q    And you were unable to complete what she
17   asked you to do, correct?
18       A    I tried to.
19       Q    And she was angry, correct?
20       A    Correct.
21       Q    And stated that you were not a monkey in
22   a suit?
23       A    No. She said, "You are a monkey in a
24   suit."
25       Q    Oh, you are a monkey in a suit?

1        A    Right.
2        Q    She didn't say, "You are not a monkey in
3    a suit"?
4        A    No.
5        Q    Do you know what that term means?
6        A    You are a monkey in a suit? As an
7    African American, I find that pretty offensive.
8        Q    That wasn't my question. To you, I guess
9    that's what the term means, that it's referring to
10   your race?
11       A    Correct.
12       Q    Have you ever seen the advertisements by
13   CareerBuilders.com on TV with the monkeys in suits?
14       A    No.
15       Q    You never saw any of them?
16       A    An advertisement on TV for Career
17   Builders?
18       Q    Dot com.
19       A    I don't remember seeing that.
20       Q    They had a whole series of advertisements
21   running for about, from 2005 to 2012, where they
22   featured monkeys in suits. Did you ever see any of
23   them?
24       A    No.
25       Q    And there were a lot of comments in the

1    Defendant Exhibit D-24 for identification.)
2    BY MS. DONNELLY:
3    Q    Does this reflect that you took time off?
4    A    Yes, it does.
5    Q    Thank you.
6         And why do you believe that those
7    statements made by Rob Kerr were based upon your
8    race?
9    A    Those were -- I didn't say that Rob Kerr
10   talking about that was necessarily based upon my
11   race. I said it was more sexual.
12   Q    Okay. Are you aware that the claims in
13   your Complaint were for race discrimination and
14   retaliation based upon complaints of race
15   discrimination?
16   A    Correct.
17   Q    So this may have been my fault, but when
18   I'm asking about examples of discrimination, I am
19   asking about examples of discrimination based upon
20   your race, which are the only claims that are in
21   your Complaint.
22   A    Okay. I can tell you about that. I was
23   called -- you didn't say that before. I was called
24   a monkey by Kate Wagner.
25   Q    Okay. Let's talk about that.

1    A    Okay.
2    Q    You were called a monkey by Kate Wagner?
3    A    Monkey in a suit. You're a monkey in a
4    suit.
5    Q    In what context did Kate Wagner say that
6    you were a monkey in a suit?
7    A    She was talking about a case and coverage
8    of a case and she was yelling and she was -- one
9    thing she was yelling was, "You are a monkey in a
10   suit."
11   Q    When did this occur?
12   A    Around February, I believe.
13        (Bates D 500 is received and marked
14   Defendant Exhibit D-25 for identification.)
15   MS. DONNELLY:   Just note that he directed
16   her attention to the specific allegations in the
17   Complaint.
18        MR. SOLOTAROFF:   Please direct that --
19   mark that, and say it's absolutely okay. That's
20   ridiculous.
21   BY MS. DONNELLY:
22   Q    Is that the comment that you're referring
23   to?
24   A    Correct.
25   Q    Now, when she said you're a monkey in a

1    suit, actually you say, offended by your monkey in a
2    suit comment?
3    A    Right.
4    Q    Was she upset over something that had
5    occurred in the workplace?
6    A    Yes.
7    Q    What had happened?
8    A    She wanted me to cover a particular case
9    for her and I tried to on several occasions, and the
10   judge wanted to speak to her and I asked her to come
11   to court and then she started yelling at me, "You
12   are a monkey in a suit."
13   Q    So she had asked that you cover for her
14   in a certain courtroom?
15   A    Correct.
16   Q    And you were unable to complete what she
17   asked you to do, correct?
18   A    I tried to.
19   Q    And she was angry, correct?
20   A    Correct.
21   Q    And stated that you were not a monkey in
22   a suit?
23   A    No. She said, "You are a monkey in a
24   suit."
25   Q    Oh, you are a monkey in a suit?

1    A    Right.
2    Q    She didn't say, "You are not a monkey in
3    a suit"?
4    A    No.
5    Q    Do you know what that term means?
6    A    You are a monkey in a suit? As an
7    African American, I find that pretty offensive.
8    Q    That wasn't my question. To you, I guess
9    that's what the term means, that it's referring to
10   your race?
11   A    Correct.
12   Q    Have you ever seen the advertisements by
13   CareerBuilders.com on TV with the monkeys in suits?
14   A    No.
15   Q    You never saw any of them?
16   A    An advertisement on TV for Career
17   Builders?
18   Q    Dot com.
19   A    I don't remember seeing that.
20   Q    They had a whole series of advertisements
21   running for about, from 2005 to 2012, where they
22   featured monkeys in suits. Did you ever see any of
23   them?
24   A    No.
25   Q    And there were a lot of comments in the

1 commercials at those times regarding that you don't
2 want to just work with monkeys in suits.
3          MR. SOLOTAROFF:  Are we testifying now?
4          Do you remember any of this stuff?
5          THE WITNESS:  No.
6 BY MS. DONNELLY:
7     Q     Do you remember any of this?
8     A     No.
9     Q     Do you watch the Super Bowl?
10    A     No.
11    Q     One of the ads was run during the Super
12 Bowl.
13          MR. SOLOTAROFF:  This is very
14 interesting, but I'm not sure where we're going with
15 this.
16    Q     You didn't see that ad during the Super
17 Bowl?
18    A     I don't watch the Super Bowl.
19          MR. SOLOTAROFF:  Asked and answered for
20 the hundredth time.
21    Q     Do you think that careerbuilders.com was
22 being discriminatory when they used --
23    A     I didn't see the ad. I don't know what
24 you're talking about.
25          MR. SOLOTAROFF:  You've got to be kidding

1 me.
2 BY MS. DONNELLY:
3     Q     Do you think they were being
4 discriminatory when they used --
5     A     I have no idea, I've never seen this ad,
6 so I don't know -- I can't even answer that.
7     Q     Is it just the reference to you that you
8 find offensive?
9          MR. SOLOTAROFF:  Objection to the form.
10    A     As an African American, being referred to
11 as a monkey is offensive to me. And to most African
12 Americans, I would think it is offensive to them.
13 BY MS. DONNELLY:
14    Q     And who did you complain to about this
15 comment?
16    A     Like 10 people because I was in shock.
17    Q     Who?
18    A     Oh, let's see, Ryan.
19    Q     And what did Ryan say?
20    A     People couldn't believe it that somebody
21 would say that.
22    Q     I'm not asking what people said. I'm
23 asking what Ryan said. What did Ryan say?
24    A     Oh, I don't remember specifically.
25 Everybody was in shock, like, what? That was the

1 reaction.
2     Q     Who is "everybody"?
3     A     Everybody I told.
4     Q     Who is "everybody"?
5     A     Well, let me go through the list, then.
6 Let's see. I told Sam Tuful. I told Dan
7 Vanderwick, something like that is his last name,
8 the maintenance guy, who used to help me when I
9 broke my foot. Let's see, I told Ryan. I told
10 Tanya. I told LaToya. I told Rashika. I told a
11 lot of people. I was in shock.
12    Q     You told Rashika?
13    A     She was working there at the time. I
14 told --
15    Q     What bureau was she in at the time?
16    A     Major Crime.
17    Q     Ryan, who is Ryan?
18    A     He was in Narcotics.
19    Q     What was his position?
20    A     He was an ADA.
21    Q     Who is the other one, Sam --
22    A     Sam. Samantha Tuful.
23    Q     What's her position?
24    A     She's was a secretary.
25    Q     Dan Vanderwick is the maintenance guy?

1     A     Uh-hum.
2     Q     Tanya is an ADA, correct?
3     A     Uh-hum.
4     Q     LaToya is an ADA, correct?
5     A     Correct.
6     Q     Rashika is an ADA, correct?
7     A     Yes. And Janeece, she's -- she delivers
8 the mail, she works in the mailroom; we were
9 friends.
10    Q     Did you tell Bob Ewald?
11    A     I -- I told her hoping that it would just
12 be resolved.
13    Q     This would go a lot quicker if you just
14 answered the questions I'm asking.
15          MR. SOLOTAROFF:  All right. This would
16 go a lot quicker if you didn't ask stupid questions.
17          But having said --
18          MS. DONNELLY:  Whether or not she told
19 Bob Ewald is not a stupid question.
20          MR. SOLOTAROFF:  No. You're right, that
21 one isn't, I was about to say that that's not a
22 stupid question. Asking about Career Builders is a
23 really stupid question and probably wasted more time
24 than anything in this --
25          MS. DONNELLY:  That's your opinion.

1 Luckily, I don't really care about it.
2     MR. SOLOTAROFF:  Well, I'm going to
3 advise her that that was a good question. Just
4 answer the question. She asked you if you talked to
5 Bob Ewald. Don't say anything else but "yes" or
6 "no" whether you talked to Bob Ewald.
7     A    No.
8 BY MS. DONNELLY:
9     Q    Did you talk to Joe Carroll?
10     A    No.
11     Q    Did you complain to Emily Constant?
12     A    No.
13     Q    Did you complain to Ed Heilig?
14     A    No.
15     Q    Did you complain to Thomas Spota?
16     A    No.
17     Q    Did you complain to anybody in any
18 position of authority?
19     MR. SOLOTAROFF:  Objection to the form.
20     A    I told -- I did tell Emily and Ed Heilig.
21 They already knew. They were, like, she apologized.
22 She didn't apologize.
23 BY MS. DONNELLY:
24     Q    You told them at your termination?
25     A    Right. You asked me if I told them and

1 the answer is yes, I did.
2     Q    Okay. I was talking at the time.
3     MR. SOLOTAROFF:  You didn't say that.
4     THE WITNESS:  No.
5     MS. DONNELLY:  No, I was not clear.
6 BY MS. DONNELLY:
7     Q    Did you say anything to Kate Wagner?
8     A    I told you I did.
9     Q    What was her response?
10     A    Nothing.
11     Q    Did she continue to work with you after
12 you sent that e-mail?
13     A    Yeah. But she --
14     Q    Did you continue to work with her?
15     A    Yes.
16     Q    Did she make any other comments?
17     A    No.
18     Q    Had she ever make any comments before
19 this that you found to be offensive?
20     A    No.
21     Q    Other than this comment that you found to
22 be offensive, did anyone at the D.A.'s office make
23 any other comments regarding your race that you
24 found to be offensive?
25     MR. SOLOTAROFF:  Objection to the form.

1     A    Can you say that again?
2 BY MS. DONNELLY:
3     Q    Sure. Did anyone at the D.A.'s office
4 make any other comments regarding your race that you
5 found to be offensive?
6     A    I would say the treatment, yes, but
7 statement like "monkey in a suit," no.
8     MS. DONNELLY:  Would you mark that?
9     (Bates D 067 is received and marked
10 Defendant Exhibit D-26 for identification.)
11 BY MS. DONNELLY:
12     Q    Have you seen that document before?
13     A    Yes.
14     Q    Can you tell me what it is?
15     A    It's a letter to Bob.
16     Q    That was never sent to Bob, though,
17 correct?
18     A    Correct.
19     Q    It was drafted by you, but not sent to
20 him?
21     A    Because I was hoping it would be cleared
22 up.
23     MR. SOLOTAROFF:  Yes or no.
24     A    It was not sent to him.
25

1 BY MS. DONNELLY:
2     Q    Was it provided to anybody?
3     A    What do you mean by that, "provided to
4 anybody"? I think it was on my e-mail.
5     Q    Well, it's on your e-mail from you to
6 you.
7     A    Right.
8     Q    Did you ever send it to anybody at the
9 D.A.'s office?
10     A    No.
11     Q    Did you ever send it to anybody but your
12 attorney?
13     A    No.
14     (Bates D 503 is received and marked
15 Defendant Exhibit D-27 for identification.)
16 BY MS. DONNELLY:
17     Q    Have you ever seen this document before,
18 this e-mail before?
19     A    Yes.
20     Q    When?
21     A    When I filed the case with the Equal
22 Opportunity Commission.
23     Q    Actually, you filed with the New York
24 State Division of Human Rights, correct?
25     A    Right.

1 else.
2     Q    That's also not part of the Complaint.
3          MR. SOLOTAROFF:  I mean, you can't have
4 it both ways.
5 BY MS. DONNELLY:
6     Q    Same answer. I already got that answer.
7 Anything other than what you've told me already?
8     A    About race?
9     Q    Yes.
10    A    The fact that I was targeted, it's pretty
11 clear why I was targeted, why I was treated so
12 badly.
13    Q    Targeted by who?
14    A    I was one -- for years, I was one of
15 three people who were black at the office.
16    Q    Targeted how?
17    A    Treated unfairly, spoken to poorly.
18 We're at a Christmas party, Beth is calling me
19 stupid. She wants to go on vacation without her
20 husband, she's like, well, you're stupid. It's
21 like -- it was the worst place ever to be.
22    Q    That, you believe, is based on your race?
23    A    Well, yeah. You could talk to -- they
24 felt they could treat me like that.
25    Q    Did they talk to Tanya like that?

1    A    I don't know.
2    Q    Did you ask Tanya if they spoke like
3 that?
4    A    I was trying to survive. I'm not worried
5 about Tanya.
6          MR. SOLOTAROFF:  "Yes" or "no," if you
7 can answer "yes" or "no."
8    A    I don't know.
9 BY MS. DONNELLY:
10    Q    You don't know if --
11    A    How they were treating Tanya. I know
12 they were making fun of her.
13    Q    Did you talk to Tanya about that?
14    A    No.
15    Q    How do you know they were making fun of
16 her?
17    A    Because I was there, when she'd walk out
18 the room, they'd make fun of her.
19    Q    What did they say?
20    A    They made fun of her. Just silly things,
21 making fun of her. I was trying to stay focused on
22 me.
23    Q    What did they say?
24    A    Just stuff making fun of her.
25    Q    What stuff?

1    A    Just about food and her weight and she'll
2 do anything for food and cookies and just silliness.
3 But she -- you know, Ryan, they make fun of him, he
4 has -- he's seen as much ass as a toilet bowl.
5 Every -- I mean, the black people, that's what
6 happens to you in Narcotics.
7    Q    They don't make fun of anybody else?
8    A    Not as much. Not as much.
9    Q    But they do?
10    A    Not like -- not like the -- I mean, you
11 have to have a tough skin and I really tried for a
12 very long time.
13    Q    Did you receive an evaluation while you
14 were in Narcotics?
15    A    Yes.
16    Q    And was it a good evaluation?
17          MR. SOLOTAROFF:  Objection to the form.
18          Can she wait to read the evaluation to
19          answer or do you want her to answer?
20          MS. DONNELLY:  She can answer whether it
21 was a good evaluation.
22    A    I need to see...
23 BY MS. DONNELLY:
24    Q    You don't remember whether or not it was
25 a good evaluation?

1    A    You want me to recall from memory?
2    Q    Yes.
3    A    It said, regarding ethical consideration,
4 I think it said very good. What else. It said that
5 I did great work with the JDP. No. 5 for well
6 dressed for court. I didn't know I would be
7 quizzed. Can I --
8    Q    You didn't know you would be quizzed?
9    A    On the evaluation.
10    Q    In your deposition, is that what you just
11 said?
12    A    Yeah.
13          MR. SOLOTAROFF:  Most people, if they
14 refer you to a document, they show the witness the
15 document.
16          MS. DONNELLY:  I like to know what the
17 witness knows before I show her a document.
18          Would you mark it?
19          (Bates D 484-488 is received and marked
20 Defendant Exhibit D-28 for identification.)
21 BY MS. DONNELLY:
22    Q    Have you seen this document before?
23    A    Yes.
24    Q    Do you consider this to be a good
25 evaluation?

1           MR. SOLOTAROFF: Objection to the form.
2     A    It says prepared for court, very good.
3 Courtroom demeanor, very good. Maturity, very good.
4 Appearance and ethical obligations, exceptional. I
5 mean, it says overall performance, average.
6 BY MS. DONNELLY:
7     Q    So do you consider that to be a good
8 evaluation?
9     A    I think it is okay. It's not stellar and
10 it's not bad. That's why it said average.
11     Q    How did you get the evaluation?
12     A    I joined the meeting with the supervisor,
13 Bob Ewald.
14     Q    Was anyone else present?
15     A    There was one other person present. He
16 came from SID. It was just one other person
17 present. Mark Murray.
18     Q    Was Mark Murray the deputy bureau chief?
19     A    Correct.
20     Q    Did Bob Ewald counsel you regarding your
21 attendance or, I should say, timeliness, during your
22 evaluation?
23     A    Yes.
24     Q    And it says three of five. "Avemaria
25 Thompson manages the Judicial Diversion Part and is

1 assigned with other ADAs to general courtroom
2 coverage on the same floor. This includes one other
3 Part. Particularly over the past few years, she has
4 been consistently late arriving for work, generally
5 by 20 to 40 minutes. No supervisor is notified. I
6 have spoken with her personally about it and have
7 addressed the bureau in general about the need to be
8 prompt in order to be effective. Nevertheless, her
9 tardiness continues. We have discussed this again
10 during the evaluation process and it is anticipated
11 that it will no longer be an issue."
12        Do you see that?
13     A    Yes.
14     Q    Was that discussed with you?
15     A    Yes.
16     Q    Did you sign this evaluation?
17     A    Yes.
18     Q    Did you make any comments about your
19 evaluation to Bob Ewald?
20     A    Yes. I said that I wasn't arriving 40
21 minutes late. And I think that was it. And he said
22 that -- that was the only discussion. I said it
23 should read 20 to 30, and not 20 to 40.
24     Q    Because you believe you were not arriving
25 40 minutes late for work?

1     A    Correct.
2     Q    And if your time records reflect
3 differently, would they be in error?
4     A    No. They wouldn't be in error, but that
5 doesn't show all the times that I arrived; it only
6 shows the times that I arrived.
7     Q    What do you mean?
8     A    Because not -- if somebody opened the
9 door for me, now that doesn't count.
10     Q    Did you provide any text in the space
11 provided on the evaluation?
12     A    No.
13     Q    Did you discuss any of the discriminatory
14 or harassing conduct that you felt was occurring in
15 the bureau during your evaluation?
16     A    No.
17     Q    After you received the evaluation, which
18 specifically stated and mentioned your problem with
19 lateness, did you improve in your timely arrival at
20 the office?
21     A    No.
22     Q    Why not?
23     A    Other people are coming in at the same
24 time. Bob is drinking beer with you on Fridays.
25 It...

1     Q    So despite being specifically told to
2 arrive on time during your evaluation, you chose not
3 to?
4     A    Correct.
5     Q    Was there also a bureau meeting scheduled
6 shortly after you received your performance
7 evaluation?
8     A    Yes.
9     Q    Did you attend that meeting?
10     A    No. I asked if we were going to have it
11 and Mark Murray said, oh, Bob forgot all about it
12 and then I left.
13     Q    Did Bob text you and ask where you were?
14     A    Yeah. I didn't see the text until
15 afterwards.
16     Q    Did you ever respond to the text?
17     A    No.
18     Q    Where were you when you received the
19 text?
20     A    I didn't see the text until I got back
21 and then I saw the text and I told Mark. And he's
22 like, oh, it's no problem. Yeah, we ended up having
23 a meeting. You know, he just made it very casual.
24     Q    Where were you at the time that the
25 meeting was held?

1     A    I got out of court late and I said I was
2 going to go get something to eat, that's why I asked
3 if we are going to have a meeting. Because if we
4 are going to have a meeting, then I am not going to
5 go get something to eat. So he's like, oh, Bob
6 forgot about it. I said, okay.
7     Q    Was there an e-mail regarding the
8 meeting?
9     A    There was, but he said Bob forgot about
10 it. That sounds like --
11     Q    How did you --
12     A    -- he's not going to have it.
13     Q    How did you talk to Mark Murray?
14     A    What do you mean "how"?
15     Q    How did you communicate with him
16 regarding the meeting?
17     A    I spoke to him.
18     Q    He was down in court or you went up to
19 the court?
20     A    I went to the floor and I asked him. And
21 he's like, they had the meeting. And I'm like --
22     Q    To go to the floor from court, did you
23 have to swipe?
24     A    To go to the floor from court, yes.
25     Q    When you had your meeting with Bob

1     Q    And yet every time you asked for a
2 morning to come in late or a day off or an afternoon
3 to leave early, those requests were accommodated,
4 correct?
5     A    I can't say every time. I don't know.
6     Q    I really don't want to go through all the
7 e-mails.
8     A    Days I've asked for, I didn't always get.
9     Q    I am not talking about --
10     A    Okay. So please ask the question again.
11     Q    Your request to come in late and leave
12 early or for days off were routinely granted,
13 correct?
14     MR. SOLOTAROFF:   Objection to the form.
15     A    I would say often granted.
16 BY MS. DONNELLY:
17     Q    Can you think of any specific examples of
18 when they were denied?
19     A    I can't recall. But I -- I don't
20 believe, so I don't know. I don't -- I really don't
21 know if they were always, always granted. Can I say
22 that? No.
23     Q    You can say you don't know.
24     A    I don't know.
25     Q    But more often than not?

1 regarding your performance appraisal, did Bob ask
2 you what your career goals were?
3     A    Yes.
4     Q    And what did you tell him?
5     A    I told him that I wanted to go to Major
6 Crime, a different bureau.
7     Q    Did you ask Bob to change the statement
8 from, you were consistently late by 20 to 40 minutes
9 to, you were always late by 30 minutes?
10     A    No. I didn't say it like that. That was
11 not how it was said.
12     Q    During the evaluation when he brought up
13 the issue of lateness, did you ever say to him that
14 you were late because you were putting your children
15 on the bus?
16     A    I don't -- I don't know if I did. I
17 don't know.
18     Q    At any time during your employment in the
19 Narcotics Bureau, did you ask to start at 9:30?
20     A    Andy was coming in at that --
21     Q    That was not my question. At any time
22 during your employment with the Narcotics Bureau,
23 did you ask to come in late so you could put your
24 children on the bus?
25     A    No, I did not.

1     A    That would be a correct statement.
2     Q    And you never asked for an accommodation
3 to put your kids on the bus, correct?
4     A    Correct.
5     Q    Did Bob also speak to you about negative
6 interactions you had had with other ADAs in the
7 Narcotics Bureau during your performance evaluation?
8     MR. SOLOTAROFF:   Objection to form.
9     A    During the performance evaluation, no, he
10 did not. As a matter of fact, it's marked I'm a
11 team player.
12 BY MS. DONNELLY:
13     Q    That was not discussed during the
14 performance eval --
15     A    Right.
16     Q    Was it discussed at any time?
17     A    It was discussed prior.
18     Q    You mentioned the incident with John
19 Scarlatto, correct?
20     MR. SOLOTAROFF:   Objection. Objection to
21 the form.
22 BY MS. DONNELLY:
23     Q    Did you and Bob ever speak about your
24 interactions with John Scarlatto?
25     A    No. He was right there when it's all

1   taking --
2           MR. SOLOTAROFF:   Again, remember, "yes"
3   or "no."
4       A   No.
5   BY MS. DONNELLY:
6       Q   You identified the comment that Kate
7   Wagner made that you found to be offensive.  Did you
8   ever discuss that with Bob Ewald?
9       A   No, I did not.  She had sent him a text.
10          MR. SOLOTAROFF:   Come on.
11          THE WITNESS:   Sorry.
12  BY MS. DONNELLY:
13      Q   You also had an interaction with Meg
14  Farrell; is that correct?
15      A   Correct.
16          MR. SOLOTAROFF:   Objection to the form.
17  BY MS. DONNELLY:
18      Q   What was the basis of that interaction?
19  "Altercation" is a better word.
20      A   I don't know.  Meg -- Meg argued with a
21  lot of people.  She called John Scarlatto a --
22          MR. SOLOTAROFF:   Ave, I really --
23      A   So what's the question again?
24          MR. SOLOTAROFF:   What happened --
25

1   BY MS. DONNELLY:
2       Q   What was the altercation you had with Meg
3   Farrell?
4       A   I wouldn't call it an altercation.  She
5   was more yelling -- yelling at me.  She
6   was arguing with a lot of people in the office; I
7   was one of many.
8       Q   And you sent her an e-mail?
9       A   Yeah.  I said please don't do that
10  anymore.
11      Q   It's not professional --
12      A   I thought I was being nice.  I didn't
13  yell back.  I didn't say anything mean back.
14      Q   Why didn't you discuss that with her in
15  person?
16      A   Somebody who is pointing their finger at
17  you and acting like that, it could escalate.  It's
18  better you just send them an e-mail and maybe, you
19  know, things will just work out.  You're hoping for
20  the best.
21      Q   It seems that you rarely spoke to anyone
22  that you were having an issue with in person, you
23  always sent an e-mail; is that a fair statement?
24          MR. SOLOTAROFF:   Objection.
25      A   Yeah.  You're hoping it's just resolved

1   and that would be the end.
2           MR. SOLOTAROFF:   All right.
3   BY MS. DONNELLY:
4       Q   Is it easier to resolve things, for you,
5   through e-mails?
6           MR. SOLOTAROFF:   Objection to the form.
7       A   In certain situations, yes, it is.  It
8   is.  If you just explain -- I didn't think I said
9   anything horrible telling Kate that African American
10  being referred to as a monkey is offensive.
11  That's -- I mean, that's not anything mean and
12  nasty, that's just something -- a comment, a
13  commentary on your comment.
14  BY MS. DONNELLY:
15      Q   Why wouldn't you want to have that
16  discussion with her in person?
17          MR. SOLOTAROFF:   Objection to the form.
18      A   Because she was yelling at me the last
19  time she spoke to me.
20  BY MS. DONNELLY:
21      Q   I'm not saying right away.  You didn't
22  send the e-mail right away either.
23      A   Yeah.  But if somebody's yelling at you,
24  you're not going to want to approach them to get
25  some more, for them to yell at you some more.

1       Q   Wasn't that kind of the nature of the
2   business of being a lawyer, especially a prosecutor?
3           MR. SOLOTAROFF:   Objection.
4       A   To subject yourself to yelling?
5   BY MS. DONNELLY:
6       Q   To stand up for yourself?
7           MR. SOLOTAROFF:   Objection.
8       A   I tried to.
9           MR. SOLOTAROFF:   I mean, really.
10  BY MS. DONNELLY:
11      Q   And be assertive?
12          MR. SOLOTAROFF:   Oh, my God.
13      Q   Did you consider yourself to be a good
14  prosecutor?
15      A   I did.  He said I was average.  I was
16  fine.  I got promoted.  I got a bonus a few months
17  before I was let go, saying how great my work was.
18      Q   Did you consider yourself to be a good
19  prosecutor?
20      A   Well, if you get a letter from your boss
21  saying how great your work is --
22          MR. SOLOTAROFF:   Ave, Ave.
23      A   I thought I was okay.
24  BY MS. DONNELLY:
25      Q   Do you know what a Darden hearing is?

1    that correct?
2       A    Correct.
3       Q    What caused that argument?
4       A    Because someone was telling me that she
5    was saying all this stuff about me. But she talked
6    about everybody, so I shouldn't have gotten -- I was
7    wrong. I shouldn't have gotten upset. That's how
8    it is.
9       Q    Did Bob Ewald meet with the both of you
10   after that text exchange?
11      A    Yes.
12      Q    When did that occur?
13      A    Like, 2012 or 2013.
14      Q    And during that meeting, did he offer you
15   both the opportunity to transfer out of the unit if
16   you wanted to?
17      A    No, I don't remember that.
18      Q    You don't recall that?
19      A    No.
20      Q    If he had offered you that opportunity,
21   would you have taken it at the time?
22             MR. SOLOTAROFF:  Objection. Objection to
23   the form.
24      A    Maybe.
25

1    BY MS. DONNELLY:
2       Q    Other than the comments and conduct
3    you've already identified, is there any other
4    conduct that you believe was based upon your race?
5       A    I mean, there was all the -- based upon
6    my race? I guess the Jamaican men comment is not
7    about -- the Jamaican men, whether or not they have
8    large penises is bordering on both sexual and race
9    related.
10      Q    Who made that comment?
11      A    Bob Ewald.
12      Q    When did he make that comment?
13      A    When I first -- one of the -- when I
14   first arrived.
15      Q    Where was it made?
16      A    In the conference room.
17      Q    When you say when you first arrived, when
18   do you mean?
19      A    Like, around 2009, 2010.
20      Q    Early on in your tenure there?
21      A    Correct.
22      Q    Anything else?
23      A    That's what I can remember right now.
24      Q    You are no longer employed by the Suffolk
25   County D.A.'s office, correct?

1       A    That is correct.
2       Q    How did your employment end?
3       A    Being called into the Hauppauge office
4    and in a conference room I was told.
5       Q    Who told you?
6       A    Ed Heilig and Emily Constant.
7       Q    On the day you were called to the
8    Hauppauge office, did you arrive for work on time?
9       A    No, I did not.
10      Q    On the day that you were called to the
11   Hauppauge office, were you scheduled to leave work
12   early?
13      A    Yes.
14      Q    What day was that?
15      A    May 29th.
16      Q    Who told you that you had to go to the
17   Hauppauge office?
18      A    Mark Murray.
19      Q    Did you go to the Hauppauge office?
20      A    I did.
21      Q    Who did you meet with there?
22      A    Emily Constant and Ed Heilig.
23      Q    What did they say to you and what did you
24   say to them?
25      A    They said I was terminated. They gave me

1    a letter saying I was terminated.
2       Q    That's all they said?
3       A    They -- I told them about my treatment,
4    how I was treated. They said -- Emily said I get
5    plenty of complaints from people and that you didn't
6    come to me. And when I told her about Kate's
7    comment, she's like, she apologized to you and I'm
8    like, no, she didn't.
9       Q    Anything else?
10      A    And I told her I was treated like this
11   because I'm a black woman. I've been treated very
12   poorly for a long time. And she was, you know,
13   dismissive. She is like, she apologized.
14      Q    Any other discussion? Did you ask why
15   you were being terminated?
16      A    She said that I was being terminated for
17   being late and to hand over the badge, access card,
18   and ID card, and I did at that point, all three
19   items.
20      Q    Did you ask for a second chance?
21      A    I did. I asked to go to a different
22   bureau.
23      Q    What was her response?
24      A    "No."
25      Q    When you were leaving, did you state to

1  Emily and Ed, "This is what I get for putting my
2  kids on the bus"?
3       A    Yeah, because as a black woman -- if I
4  had been a white woman putting my kids on the bus,
5  no problem.
6       Q    And you know that because you asked?
7       A    Yeah, because Andy was putting his kids
8  on the bus coming in the at same time, no problem.
9       Q    Do you know whether Andy asked to put his
10  kids on the bus?
11      A    No, I don't. But people were looking for
12  him and nobody knew --
13      Q    But you do know --
14      A    -- where he was.
15      Q    -- you didn't, correct?
16      A    I didn't, no.
17      Q    So you did not ask?
18      A    I didn't ask about whether he did or not,
19  but I know people were looking for him in the
20  morning.
21      Q    No. You did not ask?
22      A    About what?
23      Q    To be late?
24      A    Right.
25      Q    Do you know who made the decision to fire

1  you?
2       A    No.
3       Q    Who was the letter signed by?
4       A    Mr. Spota.
5       Q    Mr. Spota's the same individual who
6  offered you employment with the D.A.'s office,
7  correct?
8       A    Correct.
9       Q    After the termination of your employment,
10  did you discuss your termination with anyone at the
11  D.A.'s office?
12      A    Yes.
13      Q    Who?
14      A    Let's see. Janeece.
15      Q    I'm going to ask that as you give me
16  these names, you tell me who they are.
17      A    Okay. Janeece Bennett is someone who
18  worked in the mailroom.
19           Can you ask the question again?
20      Q    Yes. Did you tell anybody at the D.A.'s
21  office about the termination of your employment at
22  the time that it happened?
23      A    I would say LaToya, Janeece, Rashida,
24  Ryan. I mean, people already knew, so it wasn't
25  like me telling them. People were calling me --

1       Q    I'm not asking what people knew. I'm
2  just asking if you told anyone about it.
3       A    Well, they were calling me to tell me
4  they heard. People sent me text messages, sorry to
5  hear.
6       Q    Who?
7       A    I don't want to get these people in
8  trouble.
9           MR. SOLOTAROFF:  No. No. It's okay.
10  It's all right. If you talked to somebody about it,
11  you have to...
12      A    I didn't really talk to them about it,
13  they were just like, sorry to hear.
14           So is your question, did I talk to them
15  about it?
16      Q    No. I'm asking who texted you?
17      A    Sheetal, ADA, Sheetal. Who else sent me
18  a text? Jen Greensac sent me a text. Ryan left me
19  a message, I'm sorry to hear. A few people who I
20  worked with.
21      Q    Did you maintain any of these texts or
22  messages?
23      A    No.
24      Q    After the termination of your employment,
25  did you meet with anyone in the D.A.'s office

1  regarding anything?
2       A    Janeece, because I asked her if she could
3  just put my things in her car and whenever I saw
4  her, you know, at some point, I will just get
5  them -- retrieve them from the back of her car.
6  She's like, they won't give me my things. She's
7  like, she can't get them. So I told her I'll come
8  up on Friday to retrieve my belongings.
9       Q    Did you go up on Friday to retrieve your
10  belongings?
11      A    Yeah.
12      Q    Did you retrieve your belongings?
13      A    It took like two hours, they knew I was
14  coming. They made me wait. You know, it was, like,
15  not an easy task.
16      Q    Did you retrieve your belongings?
17      A    Eventually.
18      Q    Did you have a conversation with Mark
19  Murray while you were retrieving your belongings?
20      A    Yes.
21      Q    What was that conversation about?
22      A    He was sorry to hear what happened, you
23  know, the same thing everybody, I'm sorry to hear.
24      Q    You had no issues with Mark Murray while
25  you were in the bureau, correct?

1 "Inaccurate" was fine, but to say were you
2 committing a crime --
3 　　　　MS. DONNELLY: She can say I don't know.
4 She can say yes. She can say no.
5 　　　　MR. SOLOTAROFF: Say "I don't know,"
6 then.
7 　　A　I don't know.
8 BY MS. DONNELLY:
9 　　Q　Do you believe all your time sheets to be
10 accurate?
11 　　A　To the best of my knowledge, yeah.
12 　　Q　In your Complaint on Paragraph 5, and I
13 should give this back to you, but I can't find my
14 Complaint right now, you state that the hostile work
15 environment included the poem, which you identified;
16 we are not going over things we already talked
17 about, comments about the penis size of Jamaican
18 men?
19 　　A　Right.
20 　　Q　Harassment by other white ADAs, that
21 included locking you out of your office?
22 　　A　Correct.
23 　　Q　Making insensitive references to amputees
24 with the knowledge that your husband was an amputee.
25 Who made those references?

1 　　A　Joe Carroll at lunch with the conference
2 room full of people, about 10 people.
3 　　Q　Okay.
4 　　A　He went on and on about amputee men, just
5 laying there like a log, not being able to have sex.
6 　　Q　Because if you read this paragraph, it
7 states, "Defendant Ewald was and remains the chief
8 of the Narcotics Bureau. Ewald subjected
9 Ms. Thompson to a hostile work environment, this
10 included."
11 　　　　So you are not claiming that Bob Ewald
12 made that comment?
13 　　A　That was Joe Carroll.
14 　　Q　And who was present when that comment was
15 made?
16 　　A　The whole lunch table was filled with
17 people. Ryan, Beth, probably Kristen, John, Jake.
18 The whole table was filled.
19 　　Q　When was this comment made?
20 　　A　February.
21 　　Q　Of 2012?
22 　　A　Yes.
23 　　Q　Or February of 2010?
24 　　A　It was around the time of Pistorius, when
25 he was being charged with killing his ex-girlfriend.

1 And Joe was saying that -- why would that beautiful
2 girl want a guy who is an amputee. Amputees just
3 lay there like that.
4 　　　　MR. SOLOTAROFF: The time --
5 　　　　THE WITNESS: That was the time, you
6 asked me the time.
7 　　　　MS. DONNELLY: Do you know what time
8 she's referring to?
9 　　　　MR. BAPTISTE: Are we referring to when
10 he was charged or referring to when he was tried?
11 　　　　MS. DONNELLY: Charged.
12 BY MS. DONNELLY:
13 　　Q　Looks like it was 2012. Does it sound
14 about right to you two, 2012?
15 　　A　Yes. Uh-hum.
16 　　Q　The Olympics was in 2012. Was it the
17 same year as the Olympics? It was whenever that
18 happened?
19 　　A　Right.
20 　　Q　Did you say anything at the time to Joe
21 Carroll when he said that?
22 　　A　No, I did not. Everybody just stared at
23 me as he was going on and on about it.
24 　　Q　Did you report that comment to anyone?
25 　　A　No. I was trying to keep my job.

1 　　Q　We also spent a lot of time, so I don't
2 want to spend a lot of time now, going over when you
3 reported for work. When you arrived for work in the
4 morning, did you ever use a different access that
5 didn't require you to use your swipe card? A
6 different entrance? I'm sorry.
7 　　A　Once in awhile I'd come in with my friend
8 through a different way, LaToya, if we drove in
9 together.
10 　　Q　And that didn't require you to be buzzed
11 in, I mean, to swipe in? I'm sorry.
12 　　A　That didn't.
13 　　Q　What entrance was that?
14 　　A　I think that was very -- hardly ever, but
15 once or just a few times because we only carpooled a
16 few times, not, you know, a super long time.
17 　　Q　Did you ever use the buzzer at the access
18 point and ask someone to buzz you in rather than
19 using your card?
20 　　A　Yes.
21 　　Q　Why would you do that?
22 　　A　If I didn't have my card with me.
23 　　Q　We've covered a lot of ground today. Is
24 there anything that you want to tell me that I have
25 not already asked you?

1   MR. SOLOTAROFF:   Objection to the form.
2   A   No.
3   BY MS. DONNELLY:
4   Q   Anything you want to add regarding your
5   lawsuit against the county or District Attorney
6   Spota or Bob Ewald?
7   A   No, not at this time.
8   Q   Thank you.
9            MR. SOLOTAROFF:   Okay.
10           MR. BAPTISTE:   At this time, it's 6:20,
11   and subject to your counsel's representation they
12   wanted to go until 6:30, I'm not going to be able to
13   cover what the county would like to depose you about
14   in 10 minutes.  We would reserve our rights to have
15   the plaintiff brought back and hold this deposition
16   as open.  However, we're not going to require
17   production of the other defendants, happened after
18   that.  So we will have her brought back after the
19   other defendants are deposed.
20           MR. SOLOTAROFF:   Okay.
21           MR. BAPTISTE:   And we'll probably notice
22   that deposition.
23           MR. SOLOTAROFF:   Okay.
24           (Witness excused.)
25           (Time noted:  6:20 p.m.)

1   C E R T I F I C A T E
2
3        I, MARY A. PAVLIK, a Shorthand Reporter and
4   Notary Public of the State of New York, do hereby
5   certify that AVEMARIA THOMPSON, the witness whose
6   deposition is hereinbefore set forth, was previously
7   sworn, and that such deposition was a true record of
8   the testimony given by such witness.
9        I FURTHER CERTIFY that I am not related to
10   any of the parties to this action by blood or
11   marriage, and that I am in no way interested in the
12   outcome of this matter.
13        IN WITNESS WHEREOF, I have hereunto set my
14   hand this_____day of_____, 2015.
15
16
17
18
19
20
21        MARY A. PAVLIK
          Notary Public of the State of New York
22
23
24
25

1   I, AVEMARIA THOMPSON, do hereby certify
2   that the foregoing is a true and accurate transcript
3   of my testimony given on 11.23.15.
4
5
6
7
8   AVEMARIA THOMPSON
9
10   Subscribed and sworn to before me, a Notary Public
11   of the State of New York, this_____day of
     _____, 2015.
12
13
14
15
16   Notary Public of the State of New York
17
18
19
20   My commission
21   expires_____.
22
23
24
25

1                    INDEX
2   WITNESS      DIRECT   CROSS   REDIRECT   RECROSS
3   AVEMARIA THOMPSON
    By Ms. Donnelly   4
4
5                   EXHIBITS
6   ID.     DESCRIPTION                     PAGE
7   D-1   Bates Thompson 078-094             37
8   D-2   Bates Thompson 068-076             37
9   D-3   Bates Thompson 040-060             37
10   D-4   Complaint                          81
11   D-5   Bates D 275                       111
12   D-6   Bates D 274                       112
13   D-7   Bates D 273                       114
14   D-8   Bates D 003                       128
15   D-9   Bates D 1601                      164
16   D-10   Bates D 534                       167
17   D-11   Bates D 1596                      168
18   D-12   Bates D 1576                      169
19   D-13   Bates D 555                       171
20   D-14   Bates D 251                       172
21   D-15   Bates D 504                       173
22   D-16   Bates D 224                       174
23   D-17   Bates D 233-235                   174
24   D-18   Bates D 223                       175
25   D-19   Bates D 1605                      176