# EXHIBIT E

```
 1  UNITED STATES DISTRICT COURT

 2  EASTERN DISTRICT OF NEW YORK

 3  ----------------------------------------X

 4  AVEMARIA THOMPSON,

 5                          Plaintiff,

 6                      Civ. No.:

 7                      14-CV-02473

 8      - against -

 9  THOMAS J. SPOTA, ROBERT EWALD, and SUFFOLK COUNTY,

10

11                          Defendants.

12  ----------------------------------------X

13              100 Veterans Memorial Highway
                Hauppauge, New York
14

15              December 21, 2015
                11:30 a.m.
16

17      EXAMINATION BEFORE TRIAL OF THOMAS SPOTA,

18  a Defendant herein, taken by the attorney for the

19  Plaintiff, Pursuant to Notice, and held at the

20  above-mentioned time and place, before Kimberly

21  Dean, a stenographer and Notary Public within and

22  for the State of New York.

23

24

25
```

1                THOMAS SPOTA

2  background beginning with your graduation from high

3  school?

4       A.    Chaminade High School, Mineola;

5  Fairfield University, Fairfield, Connecticut.  And

6  St. John's Law School.  And then in Brooklyn.  And

7  NYU graduate school of law, which I did not

8  complete.

9       Q.    You were doing what, tax?

10      A.    No, actually, labor relations.

11      Q.    I know you've had a long career.  But,

12 could you kind of take me through it in a general

13 way, and if there is anything specific that I need

14 to ask you about I will ask you about.

15      A.    In the district attorney's office?

16      Q.    Even before that.  You graduated from

17 law school.  What's the first thing that you do?

18      A.    I was in the Marine Corps.

19      Q.    As a lawyer?

20      A.    No.

21      Q.    Then, what about after you got out?

22      A.    After I got out I worked for the Law

23 Office of Robert Corcoran in Hicksville, 85 North

24 Broadway.  For one year I worked for the -- I had a

25 general practice in New Hyde Park, which is in

1        THOMAS SPOTA

2  Nassau County.  And I worked for a year with the

3  town attorney's office for the town of North

4  Hempstead simultaneously with my practice.

5      And then I came in 19 -- the very end of '71

6  to the DA's office of Suffolk County.

7      Q.    Just ADA, regular ADA?

8      A.    I started work as a line assistant.

9      Q.    Tell me about your progression through

10 the various roles in the DA's office.

11     A.    I was with District Court Bureau for --

12 do you want to know the time frames?

13     Q.    Yes.  That is helpful.

14     A.    Six months, I would say.  Perhaps a

15 little bit longer, and I went out to the Trial

16 Bureau in Riverhead.  I went then to what we call

17 the Major Offense Bureau, which was essentially the

18 homicide bureau.  I became the deputy chief and

19 ultimately the chief of that bureau, as well as the

20 chief trial prosecutor.  I left the office in --

21 I'm sorry, 1982.  I was called back to try two

22 murder cases which took most of 1983.

23     Then, I was in the general practice of law

24 here in Suffolk County and I was elected the

25 district attorney in 2001.

1              THOMAS SPOTA

2  own policy?

3       A.    I think we refer to the county policy.

4  We may have the sexual harassment policy, which is

5  in our Operations and Procedure Manual, but for the

6  most part we follow the county policy.

7       Q.    Showing you what's been previously

8  marked as Exhibit P.  Do you recognize this

9  document?

10      A.    Yes.

11      Q.    What is it?

12      A.    This is the sexual harassment policy

13 that's contained in our Operations and Procedure

14 Manual.

15      Q.    There is also a Suffolk County policy

16 that you follow as well?

17      A.    That is a very extensive policy.

18      Q.    Is there anyone in the district

19 attorney's office who is designated as someone who

20 employees could complain to if they have a

21 complaint?

22      A.    Yes.

23      Q.    Who is that person?

24      A.    At what point?

25      Q.    Now.

```
 1                    THOMAS SPOTA
 2      A.     Edward Heilig.
 3      Q.     Is he the sexual harassment -- is he the
 4 person for sexual harassment or for other types of
 5 harassment or discrimination?
 6      A.     I think -- my recollection is he is for
 7 all types of -- all complaints, I should say.
 8      Q.     Is that written down anywhere that
 9 that's his role?
10      A.     It may be.  I'm not sure.
11      Q.     Do you know how an employee in the
12 district attorney's office would know that -- I
13 forgot to give you instructions, but we are doing
14 great.  I will do it now.
15      It is very simple.  You have been deposed
16 before, right?
17      A.     Yes.
18      Q.     Make sure that you understand my
19 question before answering and try not to talk over
20 me and I will try not to talk over you.  If you
21 need a break, let me know.  And one other thing.
22 Anyway, that's probably fine.
23      So, I was asking you is it written down
24 anywhere that Mr. Heilig is the designated
25 complaint person?
```

```
 1                    THOMAS SPOTA
 2      A.    I don't recall.
 3      Q.    All right.  When did you first meet
 4 Ms. Thompson, do you remember?  Changing the topics
 5 again.
 6      Do you remember?
 7      A.    Do I remember when?
 8      Q.    When you first met Ms. Thompson.
 9      A.    You mean the month or year?
10      Q.    Just generally.  It could be the year or
11 approximately when.  I will ask you this, did you
12 meet her before she became an ADA?
13      A.    Yes.
14      Q.    Do you remember the circumstances under
15 which you met her?
16      A.    She was introduced to me by an attorney
17 at an Armistad function.
18      Q.    Do you know what Ms. Thompson was doing
19 at the time, where she was working?
20      A.    Yes.  She was with the Queens DA's
21 office.
22      Q.    Did she express an interest in coming to
23 work for you?
24      A.    Yes.  As did Mr. Moore.  That is the
25 attorney who introduced us.
```

|    |                                                      |
|----|------------------------------------------------------|
| 1  | THOMAS SPOTA                                         |
| 2  | Q.  They both wanted to come work in the             |
| 3  | office?                                              |
| 4  | A.  No, no, no.  He was the attorney who             |
| 5  | introduced me to Ms. Thompson, and he was            |
| 6  | suggesting that if possible if we could hire her.    |
| 7  | Q.  All right.  What happened next?                  |
| 8  | A.  I believe she submitted a resume.                |
| 9  | Q.  Was she eventually hired?                        |
| 10 | A.  Yes.                                             |
| 11 | Q.  What is your role in -- do you approve           |
| 12 | every single hire?                                   |
| 13 | A.  I did not then, but I do now.                    |
| 14 | Q.  Do you know whether you approved                 |
| 15 | Ms. Thompson's hire?                                 |
| 16 | A.  Well, probably because that would have           |
| 17 | been -- I recall we had a discussion at this         |
| 18 | Armistad so I presume that I did.                    |
| 19 | Q.  Like all ADAs Ms. Thompson started in            |
| 20 | District Court, right?                               |
| 21 | A.  Yes.                                             |
| 22 | Q.  And what do you know about                       |
| 23 | Ms. Thompson's experience working in District        |
| 24 | Court?                                               |
| 25 | MS. DONNELLY:  Objection.                            |

Thomas Spota
December 21, 2015                                                65

```
 1                    THOMAS SPOTA

 2      I will tell you, in fact.  I have a document

 3   here that I will mark this Thompson AA.

 4              (Whereupon, the above referred-to

 5              document was marked as Thompson

 6              Exhibit AA for identification, as of

 7              this date.)

 8      Q.    Have you had a chance to review Thompson

 9   AA?

10      A.    Which one is that?

11      Q.    Both of them.

12      A.    I see.  Yes.

13      Q.    Does that indicate that Ms. Thompson was

14   transferred to the Case Advisory Bureau in 2008 and

15   the Narcotics Bureau in 2009?

16      A.    Yes.  But your question dealt with the

17   time of the year, and I was saying normally it's

18   September.  It was October.

19      Q.    Okay.  Now, back to the question that I

20   had before that, did you hear that Ms. Thompson was

21   late closer to the time that she started in

22   Narcotics or closer to the time of her termination?

23            MS. DONNELLY:  Objection.

24            You can answer.

25      A.    I don't think it was either one of them.
```

U.S. LEGAL SUPPORT
(877) 479-2484

```
 1                    THOMAS SPOTA
 2    I think it was in between.  That is my -- an
 3    estimate.
 4         Q.    What, if anything, did you do upon
 5    learning that from -- who did you learn it from,
 6    Mr. Ewald?
 7         A.    Yes.
 8         Q.    What, if anything, did you do?
 9         A.    I asked him to -- if he would speak to
10    her, if there was a reason why she was being late.
11    She proffered no reason whatsoever.  She told him
12    that she would change.
13         As time went on, it became apparent that she
14    was not changing.  She was consistently late.  This
15    was from Mr. Ewald to me.
16         Q.    How many conversations did you have with
17    Mr. Ewald about Ms. Thompson coming to work late?
18         A.    I couldn't tell you, but it was many.
19         Q.    We talked about progressive discipline
20    before.
21         A.    Yes.
22         Q.    Did you ask Mr. Ewald to take any
23    progressive discipline steps with her?
24         A.    I think I just answered that.
25         Q.    To speak to her?
```

1                THOMAS SPOTA

2      A.    Yes, to speak to her, find out was there

3  a reason for her being late and would she improve.

4      Q.    Right.

5      A.    And she promised that she would improve.

6  And what he was telling me was she proffered no

7  reason whatsoever but that it would change.

8      Q.    Did there -- as far as you knew the

9  lateness continued; is that right?

10     A.    Yes.

11     Q.    Then did you ask Mr. Ewald to take any

12 additional steps with respect to Ms. Thompson?

13     A.    Speak to her again. And, actually, it

14 came about more towards the -- what was the year of

15 the -- '13. 2012 was when it was in my view

16 becoming somewhat more of a concern to me and

17 certainly to Mr. Ewald because there was just no

18 change. She was consistently coming in late.

19     And we at one point decided that we were going

20 to have written evaluations. And I told the bureau

21 chiefs that one of the considerations, and it was

22 really directed toward Mr. Ewald because no one

23 else had any complaints such as this, that we were

24 going to -- they should consider tardiness and

25 lateness as one of the factors in the evaluations,

1                    THOMAS SPOTA

2    speak to the employees.

3        Q.    Why did -- now, I think we heard

4    testimony from other witnesses that the 2013

5    evaluations were the first and last evaluations

6    under your regime.

7            MS. DONNELLY:    Objection.

8            You can answer.

9        A.    I thought I had requested -- oh, maybe

10   they were made in 2000 -- yeah, I decided it was

11   like in the fall of the year before I told them we

12   are having -- excuse me, let me backtrack.  We were

13   going to have evaluations of only the District

14   Court and the Case Advisory Bureau, I believe.  We

15   decided to have evaluations of all ADAs.

16       So that would have been probably at our bureau

17   chiefs meetings in the fall of 2012.

18       Q.    Why did you decide to have -- have

19   reviews of all ADAs?

20       A.    There had been -- there had been

21   discussions between Ms. Constant, Mr. Heilig, and

22   myself that we should try written evaluations.  I

23   didn't think we needed them, except for the

24   District Court, which as I mentioned before, I

25   rarely get to the District Court.  All the other

1                    THOMAS SPOTA

2   bureaus I know everybody.  I know everything, how

3   they are performing.  I see them in their office.

4   I stop by and see them.  I see them in the

5   courtroom.

6        I speak to the judges.  I speak to their

7   supervisors.  I'm pretty much hands-on in that

8   respect.  I didn't think we needed them, but we

9   decided to do it.

10       And I was basically stressing to the bureau

11  chiefs that I wanted an absolutely fair evaluation

12  and a truthful evaluation.

13       I was concerned that bureau chiefs were going

14  to just say, oh, everybody is wonderful.

15       Q.   You specifically mentioned tardiness

16  should be something that should be part of the

17  review?

18       A.   Yes.

19       Q.   That was really for Ms. Thompson?

20       A.   Yes.  I wanted him to sit down with her

21  on a written evaluation and set this record

22  straight.

23       Q.   Did you learn that in February of 2013

24  that there was an incident between Ms. Thompson and

25  Ms. Wagner?

```
 1                    THOMAS SPOTA
 2            MS. DONNELLY:  Objection.
 3            You can answer.
 4       A.   Did I ever learn of that?
 5       Q.   Yes.
 6       A.   Yes.
 7       Q.   Did you learn of it at the time that it
 8  happened?
 9       A.   No.
10       Q.   When did you learn about it?
11       A.   I think once she filed a what is it, the
12  EEOC?  Is that it?  I think that came up then.
13       Q.   So eventually, according to what you are
14  telling us, you learned that Ms. Thompson had
15  complained about Ms. Wagner making a monkey
16  reference in a conversation with her?
17            MS. DONNELLY:  Objection.
18            You can answer.
19       A.   Something like that.  Yes.
20       Q.   Thinking back about it, is that
21  something that you consider to be a serious matter?
22            MS. DONNELLY:  Objection.
23            You can answer.
24       A.   If it was the way that your client was
25  portraying it, possibly.  But I asked Mr. Ewald to
```

1            THOMAS SPOTA

2   one that you wanted to look at because of the

3   history?

4            MS. DONNELLY:  Objection.

5            You can answer.

6       A.   I know I wanted to speak to Mr. Ewald

7   about it.  I think that he even called me even

8   beforehand and said that he had addressed this

9   matter and it was going to be taken care of, she

10  had promised it would be taken care of.

11      Q.   Did you ask --

12      A.   In fact, it even says that we have

13  discussed this again and it is anticipated it will

14  no longer be an issue.

15      Q.   Did you ask that Mr. Ewald do anything

16  else in connection with Ms. Thompson's lateness at

17  that time?

18      A.   Well, I asked him to be on the alert and

19  see if she indeed would live up to the promise that

20  she had made with respect to coming in late,

21  consistently late.

22      Q.   I will show you what's been marked

23  previously as Thompson Exhibit K.  Do you recognize

24  this document?  And if you need time to read it,

25  that is obviously fine.

```
1                    THOMAS SPOTA
2      A.    Yes.
3      Q.    Did you talk to Mr. Ewald about it?
4      A.    No.
5      Q.    After -- what, if anything, did you do
6  with respect to Ms. Thompson's lateness issues
7  after the review in March of 2013?
8      A.    Well, I spoke to Mr. Ewald on a number
9  of occasions.  I asked him to keep me apprised.
10 Hopefully that she would change.  And he from time
11 to time would tell me she did not change.
12      And I don't know how to answer it any better
13 than that.
14      Q.    Did you decide at some point she should
15 be terminated?
16      A.    Yes.
17      Q.    When was that?
18      A.    I don't remember the date, but...
19      Q.    Did you make that decision on your own
20 or in conjunction with other people?
21          MS. DONNELLY:  Objection.
22          You can answer.
23      A.    It was my decision, but I did speak to
24 other people.
25      Q.    Now, I think we talked about before how
```

1                THOMAS SPOTA

2   you think -- I believe you said this, and if I got

3   it wrong, correct me -- that termination should be

4   a last resort, right?

5        A.    Yes.

6        Q.    Did -- after the review and after

7   Ms. Thompson's lateness did not change, did you

8   request that any other steps be -- any other

9   progressive discipline steps be taken to correct

10  the problem?

11       A.    I don't know if you call it progressive

12  discipline. I just asked him to please talk to her

13  and if there's an offer of a reason. There was no

14  offer of any reason. And ultimately what happened

15  was she was -- I was being told she was continuing

16  to come in late.

17       We checked. When I say we, I had somebody

18  check. I don't recall who, I tend to think it was

19  my chief investigator, but I'm not sure -- with the

20  security guards, who were telling us that she was

21  engaging in what I consider to be a deceptive

22  practice of being buzzed in, and they said she was

23  always doing it. She didn't have to use her access

24  card because we can check access cards.

25       And the security guards were telling us that

1                THOMAS SPOTA

2  that was occurring very, very frequently.  And

3  Mr. Ewald was also telling me that she just was

4  coming in late, and I made the decision.

5      Q.    Right.  My question really was, after

6  the time that Mr. Ewald spoke to her at the time

7  the review was given, subsequent to that, did you

8  ask him to speak to her again?

9      A.    Yes.  I can't say I said it in those

10 terms, but it was understood that he would

11 continually be checking on her, and I presume to be

12 asking her.  I can't say that I directed that.

13     Q.    Did you direct that she be given some

14 sort of final warning that if she didn't start

15 coming to work on time she would be terminated?

16     A.    I don't think I did that.

17     Q.    Okay.  Now, did you consider

18 alternatives other than terminating Ms. Thompson?

19     A.    Under the circumstances as they

20 occurred, no.

21     Q.    Did you consider offering her the option

22 to resign?

23     A.    No.  That was our policy in effect at

24 the time.  And there was no reason why it would

25 vary from it.

1          THOMAS SPOTA

2          MS. DONNELLY: Reserve review and

3    execution. Thank you.

4

5          (Whereupon, the examination of this

6    witness was concluded at 1:38 P.M).

7           *         *         *         *

8

9          I have read the foregoing record of my

10   testimony taken at the time and place noted in the

11   heading hereof and I do hereby acknowledge it to be

12   a true and correct transcript of same.

13

14

15                              _____

16                              THOMAS SPOTA

17

18   Subscribed and sworn to

19   before me this _____ day

20   of _____, 2015.

21

22   _____

23      NOTARY PUBLIC

24

25