GISKAN SOLOTAROFF & ANDERSON LLP
217 Centre Street, 6th Floor
New York, New York 10013
(646) 964-9640
Jason L. Solotaroff
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

AVEMARIA THOMPSON,

                    Plaintiff,                Civ. No.: 14-2473(ADS)(KMT)

       -against-

THOMAS J. SPOTA, ROBERT EWALD,
and SUFFOLK COUNTY,

                  Defendants.
------------------------------------------------------------------X

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION................................................................................1

II.   STATEMENT OF FACTS..................................................................1

III.  ARGUMENT...................................................................................13

      A.    The Summary Judgment Standard..........................................14

      B.    Plaintiff Established a Prima Facie Case of Discrimination...............14

      C.    Plaintiff Established a Prima Facie Case of Retaliation...................16

      D.    There Are Issues of Fact Concerning Whether The Basis For
            Plaintiff's Termination Was Pretextual and Whether Plaintiff Was
            Terminated for Discriminatory and/or Retaliatory Reasons. ...............20

      E.    There Are Issues of Fact On Plaintiff's Hostile Work Environment
            Claim. ..................................................................................24

IV.   CONCLUSION...............................................................................26

# TABLE OF AUTHORITIES

## CASES

*Booth v. Conn. Dep't of Developmental Servs.,*
  2011 U.S. Dist. LEXIS 91564 (D. Conn. Aug. 16, 2011) ........................................ 14

*Brown v. Van Nostrand Reinhold Co.,*
  1991 U.S. Dist. LEXIS 13299 (S.D.N.Y. Sep. 24, 1991)........................................ 14

*Bucalo v. Shelter Island Union Free School District,*
  691 F.3d 119 (2d Cir. 2012)........................................................................................ 15

*Buchanan v. Hilton Garden Inn Westbury,*
  2008 U.S. Dist. LEXIS 124756 (E.D.N.Y. Mar. 12, 2008) ................................... 14

*Carlton v. Mystic Transp., Inc.,*
  202 F.3d 129 (2d Cir. 2000)........................................................................................ 16

*Cifra v. GE,*
  252 F.3d 205 (2d Cir. 2001)........................................................................................ 18

*Copeland v. Rosen,*
  38 F. Supp. 2d 298, (S.D.N.Y. 1999)........................................................................ 15

*Cruz v. Coach Stores, Inc.,*
  202 F.3d 560 (2d Cir. 2000)........................................................................................ 17

*Delia v. Donahoe,*
  862 F. Supp. 2d 196 (E.D.N.Y. 2012) ...................................................................... 21

*Douglas v. HIP Centralized Lab. Servs.,*
  2005 U.S. Dist. LEXIS 8753 (E.D.N.Y. Apr. 29, 2005) ....................................... 18

*EEOC v. Ethan Allen, Inc.,*
  44 F.3d 116 (2d Cir. 1994).......................................................................................... 23

*Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.,*
  2008 U.S. Dist. LEXIS 58040 (S.D.N.Y. July 30, 2008) ...................................... 23

*Fairbrother v. Morrison,*
  412 F.3d 39 (2nd Cir. 2005)........................................................................................ 25

*Graham v. Long Island R.R.,*
  230 F.3d 34 (2d Cir. 2000).......................................................................................... 16

*Greenway v. Buffalo Hilton Hotel,*
  143 F.3d 47 (2d Cir. 1998).......................................................................................... 21

*Jeffrey v. Ahmed,*
    2011 U.S. Dist. LEXIS 106607 (N.D.N.Y. Aug. 21, 2011) ...................................................... 18

*Jute v. Hamilton Sundstrand Corp.,*
    420 F.3d 166 (2d Cir. 2005)............................................................................................. 17

*Little v. NBC,*
    210 F. Supp. 2d 330 (S.D.N.Y. 2011)............................................................................ 25

*Littlejohn v. City of New York,*
    795 F.3d 297 (2d Cir. 2015)............................................................................................. 15

*Muktadir v. Bevacco Inc.,*
    2013 U.S. Dist. LEXIS 113967 (E.D.N.Y. Aug. 13, 2013)..................................................... 25

*Peralta v. Roros 940, Inc.,*
    72 F. Supp. 3d 385 (E.D.N.Y. 2014) ................................................................................. 21

*Primmer v. CBS Studios, Inc.,*
    667 F. Supp. 2d 248 (S.D.N.Y. 2009)............................................................................ 23

*Ramos v. Marriott Int'l,*
    134 F. Supp. 2d 328 (S.D.N.Y. 2001)............................................................................ 21, 24

*Schiano v. Quality Payroll Sys.,*
    445 F.3d 597 (2d Cir. 2006)............................................................................................. 14

*Stern v. Trs. of Columbia Univ.,*
    131 F.3d 305 (2d Cir. 1997),............................................................................................. 22

*Weiss v. JPMorgan Chase & Co.,*
    332 F. App'x 659 (2d Cir. 2009)...................................................................................... 22

*Windham v. Time Warner, Inc.,*
    275 F.3d 179 (2d Cir. 2001).............................................................................................. 21

*Windsor v. Tishman Speyer Props., L.P.,*
    2002 U.S. Dist. LEXIS 12304 (S.D.N.Y. July 8, 2002) .......................................................... 16

*Zhengfang Liang v. Café Spice SB, Inc.,*
    911 F. Supp. 2d 184 (E.D.N.Y.2012) .................................................................................. 14

## I.    INTRODUCTION

Plaintiff AveMaria Thompson respectfully submits this memorandum of law in opposition to the motion for summary judgment of Defendants Thomas J. Spota and Robert Ewald and the motion for summary judgment of Suffolk County.

In the typical employment discrimination case, a court will deny summary judgment if there is evidence of discriminatory animus, or if the plaintiff can show co-workers outside her protected class were treated more favorably, or if the employer did not follow its customary procedures, or if there are contradictions and inconsistencies in the statements of the employer's decision-makers. In this case, all of these factors are present. This case is singularly inappropriate for summary judgment.

## II.    STATEMENT OF FACTS

Plaintiff AveMaria Thompson, an African American woman, was hired as an Assistant District Attorney ("ADA") by the Suffolk County District Attorney's Office ("Suffolk DA's Office") in 2003,[1] after having previously served as an ADA in the Queens County District Attorney's Office from approximately 2000.[2]

Ms. Thompson was one of extremely few African-Americans employed in the Suffolk DA's Office. During the time of Plaintiff's employment, the Suffolk D.A.'s Office employed between 186 and 190 Assistant District Attorneys ("ADAs"),[3] and only approximately seven to

---

[1] Defendants Thomas Spota's And Robert Ewald's Rule 56.1 Statement Of Undisputed Material Facts ("Defs. Rule 56.1 Statement") ¶ 4.

[2] Deposition of AveMaria Thompson ("Thompson Dep."), at 106. Referenced excerpts of the Thompson Dep. are annexed as Exhibit 1 to Declaration of Jason Solotaroff in Opposition to Defendants' Motions for Summary Judgment ("Solotaroff Dec").

[3] Deposition of Emily Constant ("Constant Dep."), at 20. Referenced excerpts of the Constant Dep. are annexed as Exhibit 2 to Solotaroff Dec.

eight African American ADAs.[4] Moreover, the Suffolk DA's Office has never employed an African American Bureau Chief or Assistant Bureau Chief.[5]

Defendant Thomas Spota, the Suffolk County District Attorney, provided a false and racially offensive explanation for the lack of African American ADAs in his office. When asked to explain the paucity of African American ADAs at his deposition, Defendant Spota stated:

> The problem is many of them cannot afford to come to Suffolk County. It is a very expensive place to be. That's the common refrain from those who we offer -- those African Americans that we offer positions to. And we had many turn us down.[6]

Not only does Defendant Spota apparently subscribe to a racist stereotype that African American attorneys are poorer than white attorneys, but his statement is completely false. When asked to identify the "many" African American ADA candidates who turned down employment offers from the Suffolk DA's Office, Spota's counsel could only identify a single candidate and have not offered any evidence that she turned down the offer for economic reasons.[7]

At the Suffolk DA's Office, Ms. Thompson first served in the District Court and Case Advisory Bureaus. In December 2008, Ms. Thompson received a retention stipend.[8] In October 2009, Ms. Thompson was transferred to the Narcotics Bureau.[9] The Chief of the Narcotics Bureau was Defendant Robert Ewald. Once in the Narcotics Bureau, in September 2009, Plaintiff was promoted to the position of Senior Assistant District Attorney.[10] Promotions to the Senior ADA position were based on the recommendations of the Bureau Chief and then decided

---

[4] Deposition of Edward Heilig ("Heilig Dep."), at 37. Referenced excerpts of Heilig Dep. are annexed as Exhibit 3 to Solotaroff Dec.

[5] Heilig Dep., at 39.

[6] Deposition of Thomas J. Spota ("Spota Dep."), at 19. Referenced excerpts of Spota Dep. are annexed as Exhibit 4 to Solotaroff Dec.

[7] See May 20, 2016 Letter from Robert Tucker to Jason Solotaroff. The identification of Justina Collins was in response to a request for all African American candidates who had declined ADA employment offers. (Annexed as Exhibit 5 to Solotaroff Dec.)

[8] December 19, 2008 Inter-Office Communication. (Annexed as Exhibit 6 to Solotaroff Dec.)

[9] Assistant District Attorney Assignments (Annexed as Exhibit 7 to Solotaroff Dec.

[10] Defs. Rule 56.1 Statement ¶ 31.

2

by Defendant Spota and other senior administrators.[11]

In the Narcotics Bureau, Plaintiff was harassed by Defendant Ewald and her coworkers. This harassment, which was not inflicted on white ADAs in the Narcotics Bureau, included the following: Defendant Ewald requesting Ms. Thompson to recite in front of the other Narcotics ADAs a pornographic poem that included references to sexual positions and oral sex and ridiculing Ms. Thompson when she refused to agree;[12] Defendant Ewald constantly making racially and sexually offensive jokes in Ms. Thompson's presence including asking Ms. Thompson about the penis size of Jamaican men;[13] tolerating harassment of Ms. Thompson by other white ADAs that included a white ADA locking Ms. Thompson out of her office on a daily basis and the same ADA refusing to let Ms. Thompson read his newspaper while allowing white colleagues to do so,[14] and another white male ADA making a comment in front of other colleagues that Ms. Thompson's food (a dip) smelled like "dirty pussy";[15] making insensitive references to amputees with the knowledge that Ms. Thompson's husband was an amputee;[16] and a colleague referring to Ms. Thompson as "a monkey in a suit." [17]

The Suffolk DA's Office policies against harassment and discrimination were, for all practical purposes, non-existent. There was no anti-harassment or discrimination training.[18] Perhaps as a result, senior supervisors such as Defendant Ewald could not define sexual harassment or say to whom complaints of sexual harassment or discrimination should be

---

[11] Constant Dep., at 51-52.
[12] Deposition of Robert Ewald ("Ewald Dep."), at 83 – 84; Thompson Dep., at 8-10. Referenced Excerpts of Ewald Dep. are attached as Exhibit 8 to Solotaroff Dec.
[13] Ewald Dep., at 88-91; 200-201.
[14] Thompson Dep., at 184 – 87)
[15] Thompson Dep., at 181.
[16] Thompson Dep., at 255-57
[17] Thompson Dep., at 203-206.
[18] Heilig Dep., at 45.

3

directed.[19] Similarly, Defendant Spota testified that Ed Heilig, the Financial Crimes Division Chief and Chief Administrator, was the designated person for discrimination and harassment complaints (Spota Dep., at 14) while Emily Constant, the Chief Assistant District Attorney, insisted she was the designated person for complaints.[20]

There was also no specific policy against retaliation for making discrimination or harassment complaints in the Suffolk DA's Office.[21] Ms. Constant testified that she did not know whether there was a written policy against retaliation but that there was no need for a written policy: "having been a member of the office for 36 years, I know that both as an attorney, as a prosecutor, we would not encourage or engage in retaliatory conduct."[22] Nor, according to Ms. Constant, is there a need for a written policy against retaliation to be communicated to Suffolk DA's Office employees. When asked how the employees would know they are protected against retaliation, Ms. Constant testified: "they are attorneys ... they are prosecutors. This is what they do."[23]

Given the absence of any real anti-discrimination, anti-harassment or anti-retaliation policy, Ms. Thompson did not complain about the harassment she was experiencing other than to raise the issue directly with the people who were harassing her.

On January 26, 2012, Ms. Thompson emailed John Scarglato, the Narcotics ADA who locked Ms. Thompson's door every morning so she could not enter her office, and singled Ms. Thompson out by sharing his newspaper with other ADAs at lunch but not letting Ms. Thompson read it, to ask him to stop harassing her.[24]

---

[19] Ewald Dep., at 19-22.
[20] Constant Dep., at 28.
[21] Heilig Dep., at 47.
[22] Constant Dep., at 26.
[23] Constant Dep., at 92.
[24] Email, January 26, 2012 (annexed as Exhibit 9 to Solotaroff Dec.)

4

On February 27, 2013, Ms. Thompson had a discussion with a colleague, ADA Kate Wagner, about the coverage of a case.[25] During the discussion, Ms. Wagner made a reference to monkeys, which Ms. Thompson believed was offensive to her as an African American woman.[26] Ms. Thompson sent an email to Ms. Wagner complaining about the reference.[27] Ms. Wagner, who acknowledged the reference was "poor choice of words,"[28] immediately forwarded the email to Defendant Ewald,[29] who called Ms. Constant about it and later forwarded the email to her.[30]

Defendant Spota and the other senior administrators immediately began a process to terminate Ms. Thompson's employment in retaliation for complaining about the monkey reference. Beginning on March 4, 2013, two business days after Ms. Thompson complained to ADA Wagner, Defendant Ewald began monitoring and documenting Ms. Thompson's arrival at work.[31]

On March 14, 2013, Ms. Thompson received an annual evaluation from Defendant Ewald.[32] While the evaluation was positive in certain respects, such as evaluating Ms. Thompson as "Exceptional" in terms of Appearance and Ethical Obligations,[33] Ms. Thompson was criticized for arriving late to work.[34] In addition, four days later, on March 18, 2013, Defendant Ewald also prepared a memo to file for Ms. Thompson.[35] In the memo to file, which

---

[25] Email from AveMaria Thompson to Kate Wagner, February 28, 2013 (annexed as Exhibit 25 to Solotaroff Dec.
[26] Id.
[27] Id.
[28] Ewald Dep. at 113.
[29] Id.
[30] Constant Dep., at 43; Ewald Dep., at 108.
[31] Notes of Robert Ewald (Annexed as Exhibit 10 to Solotaroff Dec.)
[32] Assistant District Attorney Evaluation (Annexed as Exhibit 11 to Solotaroff Dec.)
[33] Id. at 1.
[34] Id. at 3.
[35] Memo – Confidential, March 18, 2013 (annexed to Solotaroff Dec. as Exhibit 12).

was prepared at Emily Constant's direction,[36] was not given or shown to Ms. Thompson,[37] and was not prepared for any other ADA in the Suffolk County DA's Office,[38] Defendant Ewald was considerably more negative concerning Ms. Thompson's lateness than he was in the evaluation. Ewald stated that he had warned Ms. Thompson that her arrivals at work could be monitored by Defendant Spota, and that Thompson had not offered any explanation for the lateness. According to Ms. Thompson, however, nothing was said about the monitoring at the meeting and she was not asked for an explanation for the lateness.[39] Moreover, in the memo to file, Defendant Ewald stated Ms. Thompson had "negative interactions" with four ADAs. Of the four ADAs, two were Scarglato and Wagner, who were the subject of complaints by Ms. Thompson and one was Meg Farrell, who, as set forth below, had performance issues that dwarfed those of Ms. Thompson. Moreover, in Ewald's contemporaneous notes concerning the dispute between Farrell and Ms. Thompson, he appeared to place the responsibility on Ms. Farrell.[40]

Ms. Thompson did arrive to work consistently after 9 a.m. but in time to cover her 10 a.m. court appearances. In her deposition, she explained coming in after 9:00 a.m. allowed her to put her children on the school bus and that she did so because others in the Narcotics Bureau also arrived after 9 a.m.[41] This was born out by the key card entries produced in discovery. They showed that at least nine other ADAs in Narcotics consistently arrived at work after 9 a.m. Specifically, the average arrival time for the following ADAs was: Hunter: 9:04; Pearce: 9:10;

---

[36] Ewald Dep., at 157. Constant, however, testified she had no recollection of requesting the memo to file to be prepared. Constant Dep., at 77.
[37] Ewald Dep., at 162.
[38] Heilig Dep., at 98; Spota Dep., at 76.
[39] Declaration of AveMaria Thompson ("Thompson Dec.") ¶4.
[40] Notes of Defendant Ewald's Concerning ADA Farrell, at D001752, attached to Solotaroff Dec. as Exhibit 13. In addition, during the text exchange between Ms. Thompson and ADA Bloomfield to which Defendants refer in Ewald's Declaration and in their 56.1 Statement, Bloomfield stated to Ms. Thompson "you look like a fat pig."
[41] Thompson Dep., at 145 – 51.

Bloomfield: 9:11; Cangero: 9:12; Barnes: 9:20; Murray: 9:21; Kubetz: 9:24; Jalayer: 9:29; Heffernan: 9:50[42]

According to the Defendants' analysis of the key card entries, Ms. Thompson's arrival at work was 9:27 a.m.[43] Yet even though several ADAs were also late and two were even later than Ms. Thompson, she was the only employee written up for being late and the only ADA in Narcotics who had a memo to file prepared about her. Although Defendant Ewald claimed that other Narcotics ADAs who came to work late had notified him, generally by text message, and obtained permission,[44] Defendants produced no contemporaneous evidence – text messages or otherwise -- to support that contention. Prior to Ms. Thompson's complaint about being referred to as a monkey, there is only one document concerning Ms. Thompson's lateness, a May 10, 2011 email from Defendant Ewald reminding Ms. Thompson that she had to be in the office by 9 a.m. "particularly on JDP days."[45]

After the negative review and memo to file, Defendants took additional steps to terminate Ms. Thompson. Defendant Spota requested that Ed Heilig perform the analysis of Ms. Thompson's key card entries.[46] Mr. Heilig also selected the key card entries of other ADAs to review – but selected the entries of the two ADAs, Creighton and Hunter, who arrived earliest. Not surprisingly, the key card review showed that Ms. Thompson arrived at work later than the two earliest arriving ADAs. After the review, Defendants continued to build evidence against Ms. Thompson, documenting and exchanging emails concerning Ms. Thompson's

---

[42] Declaration of Laura Thurber.
[43] Defs. Rule 56.1 Statement ¶ 91.
[44] Ewald Dep., at 177.
[45] Email, dated May 10, 2011 attached to Solotaroff Dec. as Exhibit 14.
[46] Constant Dep.; at 81. Although Constant testified that Spota requested the key card entry review, Heilig insisted he came up with the idea himself, Heilig Dep., at 102, and Spota testified that he only learned about the review after Ms. Thompson's termination, shortly before his deposition. Spota Dep., at 35.

whereabouts.[47]

What Defendants did not do during this period is to communicate further to Ms. Thompson concerning her lateness or provide any warning to Ms. Thompson that her employment was in jeopardy. Their failure was in spite of the fact that, according to Defendant Spota and the senior administrators at the Suffolk DA's Office, they used progressive discipline to deal with ADAs with performance issues in an effort to avoid termination.[48] As Defendant Spota testified, progressive discipline is "a graduated form of discipline, starting with the lowest step, getting together, some form of conciliation. And then if that is not working, it is an increasing series of disciplines."[49] The idea, Spota agreed, was that "termination of the employee should be the last resort."[50]

Defendants practiced this approach with its other ADAs, with overwhelming success. According to Defendants, even with almost two hundred ADAs in the Suffolk DA's Office, only two ADAs have been terminated under the current management team of Spota, Constant and Heilig– Plaintiff and another woman of color, Rashika Hettiarchchi.[51] According to discovery provided by Defendants, when other white ADAs had far more serious performance issues, the ADAs' supervisors made extensive efforts to work with them to attempt to remedy the problems and avoid terminations.

One example of this was with Margaret ("Meg") Farrell, a white ADA in the Narcotics Bureau. According to Defendant Ewald's files,[52] ADA Farrell had issues with attendance as

[47] Email from Robert Ewald to Emily Constant, dated May 22, 2013 (Annexed as Exhibit 15 to Solotaroff Dec.)
[48] Heilig Dep., at 76; Constant Dep., at 53; Spota Dep., at 22.
[49] Spota Dep., at 22.
[50] Id.
[51] Heilig Dep., at 125. ADA Hettiarchchi was terminated, according to Spota, because of an alleged inability to do her job. Spota Dep., at 40. Yet other white ADAs with performance issues were demoted instead of being terminated. Id.
[52] Solotaroff Dec., Ex. 11.

8

early as 2007. According to one note, Farrell was absent from the office "in the busiest part of the day,"[53] and would be absent from the office for an entire day without notice.[54] Farrell also had performance issues that went far beyond attendance. Ewald's notes indicate that Farrell made unapproved plea offers,[55] and had CPL 180.80 (speedy trial) issues with other cases.[56] On one occasion, Defendant Ewald was cleaning out boxes left in the hallway and found two files relating to open cases of ADA Farrell that had apparently been abandoned.[57] On another occasion, on April 9, 2010, Defendant Ewald found ADA Farrell, who was supposed to be covering a court part, in a judge's chambers practicing her "golf putting."[58]

Significantly, Defendant Ewald discussed ADA Farrell's performance issues with Defendant Spota and Chief Assistant DA Constant. In one meeting in April 2010, Ewald advised Spota and Constant that Farrell's performance issues were affecting the morale of other ADAs in the Narcotics Bureau.[59]

However, Defendants still worked with ADA Farrell to improve her performance. On April 26, 2010, Defendant Ewald met with Farrell to instruct her to use the Bureau's case management system, to make sure she was available to cover court parts and to avoid socializing in a judge's chambers "to avoid the appearance of impropriety."[60] In the end, ADA Farrell was not terminated. Instead, she resigned of her own volition.[61]

---

[53] *Id.* at D001737 (not all the pages of these notes are numbered but the referenced number is extrapolated by the surrounding numbers).
[54] *Id.* at D001746.
[55] *Id.* at D001737 (spoke with [Constant] re "unapproved plea offer on Calise brothers"); D001739 ("spoke with Meg Farrell ... re [Defendant] Mauricio. No reason why she gave [offer of plea to C felony] with open A-II complaint pending.")
[56] *Id.* at D001738.
[57] *Id.* at D001742-1743.
[58] *Id.* at D001744.
[59] *Id.* at D001747.
[60] *Id.* at D001750.
[61] Constant Dep., at 57.

Another example of Defendants working extensively with an ADA to avoid termination was their handling of ▮▮▮▮▮▮▮. According to documents produced by Defendants,[62] Defendants first noted ▮▮▮▮▮ performance issues in January 2007, when she received a memorandum and then was spoken to by her deputy bureau chief, ADA Prudenti, concerning her inattention to particular cases.[63] In the meeting, Prudenti stated ▮▮▮▮▮▮ performance deficiencies had been addressed with her on three prior occasions.[64] Prudenti later advised Defendant Spota about ▮▮▮▮ issues.[65] In February 2007, Prudenti noted that ▮▮▮▮ was providing a false account of the unavailability of witnesses on one of her cases.[66] Also in February, Prudenti informed ▮▮▮ that one of her cases would have to be dismissed for speedy trial violations.[67] In April 2007, ADA Scileppi, ▮▮▮▮▮ bureau chief, met with her to go over several issues with her cases, including the failure to present appropriate plea offers, misrepresentations about statements by victims and a failure to complete a case review.[68] In a memorandum concerning this meeting, Scileppi noted that his supervisors, presumably Defendant Spota and Ms. Constant, were aware of the situation and asking why the case review had not been completed.[69] Later in April 2007, ▮▮▮▮ supervisors met with her again concerning her cases and concluded: "many of the most recently assigned cases do not seem to be worked on at all."[70] ▮▮▮▮▮ supervisors agreed to continue to meet with her in order to review her progress.[71] During a subsequent meeting, ▮▮▮ could not locate or

---

[62] The files related to ▮▮▮▮ are attached as Exhibit 16 to Solotaroff Dec.
[63] *Id.* at 1760.
[64] *Id.* at 1762.
[65] *Id.* at 1764.
[66] *Id.* at 1766.
[67] *Id.* at 1767.
[68] *Id.* at 1779-1780.
[69] *Id.* at 1781.
[70] *Id.* at 1783.
[71] *Id.* at 1785.

explain the whereabouts of several files and was accused of "gamesmanship."[72] Despite all of this, ███████ remained employed by the Suffolk County DA's Office until May 31, 2007 when her employment was terminated.[73]

Someone who was treated similarly to Ms. Thompson was Ms. Hettiarachchi, another woman of color. Like Ms. Thompson, Ms. Hettiarachchi's employment was terminated shortly after she complained about being treated poorly in at the workplace. On or about November 16, 2012, Ms. Hettiarachchi complained to her supervisor that she "felt very unwelcome in [a division of Suffolk DA Office] and that she had felt that way since the arrival" and that "it was almost impossible for her to come to work feeling as she did."[74] In May 2013, Ms. Hettiarachchi's supervisor reflected the complaint in Ms. Hettiarachchi's evaluation. In July 2013, without any documented effort to improve Ms. Hettiarachchi's supposed performance issues, Defendant Spota terminated Ms. Hettiarachchi's employment.[75] Like Ms. Thompson, Ms. Hettiarachchi's employment was terminated for performance issues much less significant than performance/misconduct issues of ADAs Farrell, ███, Lippits, Blakey, and, most recently, Kurttzrock, who were permitted to resign.

In contrast, with respect to Ms. Thompson, other than the single evaluation meeting, there was no effort whatsoever to improve Ms. Thompson's lateness issue or advise her that she was in jeopardy of losing her job. Even though Defendant Ewald, Ms. Thompson's immediate supervisor, testified that he did not think her lateness warranted termination,[76] by May 23, 2013, Defendant Spota had decided to terminate Ms. Thompson's employment.[77] According to an

---

[72] *Id.* at 1786-1789.
[73] *Id.* at 1756.
[74] Suffolk County District Attorney's Office Assistant District Attorney Evaluations, at D001808 (Annexed as Exhibit 17 to Solotaroff Dec.)
[75] Letter from Spota to Clerk of the Suffolk County, annexed as Exhibit 18 to Solotaroff Dec.
[76] Ewald Dep., at 179-80; 187-88.
[77] Email from Robert Ewald to Edward Heilig, May 23, 2013 (Annexed to Solotaroff Dec. as Exhibit 19).

email from Defendant Ewald after he had been informed of the termination, Defendant Spota requested that Ewald monitor Ms. Thompson's arrival times – even though he had already decided to terminate her.[78]

On May 29, 2013, Ms. Thompson was called into a meeting with Ms. Constant and Mr. Heilig and informed her employment was being terminated.[79] During the termination meeting, Ms. Thompson claimed she was being discriminated against and relayed the incidents of harassment that had happened during her employment.[80] Ms. Constant became angry and told Ms. Thompson that she had no credibility.[81] Although Ms. Constant and Mr. Heilig claimed in their depositions that they investigated Ms. Thompson's complaints by speaking to Defendant Ewald and ADA Wagner, both Ewald and Wagner testified that no one spoke to them about Ms. Thompson's allegations after she was terminated.[82]

Despite applying for prosecutorial and other positions in New York and around the country,[83] Ms. Thompson was not able to find another position for approximately four years, when she was hired as a clinical instructor at Touro Law School at approximately half her Suffolk DA's Office salary.[84] According to Ms. Thompson, a major obstacle in her receiving a new position was having to inform prospective employers that she had been terminated from the Suffolk DA's Office.[85] Had she been offered the option of resigning, it would have been much easier for her to obtain another position.

Significantly, the DA's Office generally provided employees who were being asked to

[78] Id.
[79] Typewritten notes of termination meeting (Annexed as Exhibit 20 to Solotaroff Dec.)
[80] Constant Dep., at 34, 88-90.
[81] Id. at 89.
[82] Ewald Dep. at 198; Deposition of Mary Kathleen Fohrkolb (Wagner) ("Wagner") Dep. at 39-41). Referenced excerpts of the Wagner Dep. are annexed as Exhibit 21 to Solotaroff Dec.
[83] Thompson Dep., at 35-80.
[84] Thompson Dec. ¶5-6.
[85] Id.

leave the option of resigning. For example, ████████████, was accused of sexual harassment, including unwanted touching, by four separate ADAs.[86] After an investigation, ████ was found to have engaged in the wrongful conduct and also lied about it.[87] Yet ████ ████ was not terminated but permitted to resign.[88] Similarly, Ron Lippits, an ADA who was found to have engaged in sexual harassment, was permitted to retire in lieu of termination.[89] Michael Blakely, an ADA who had been involved in a DWI motor vehicle accident and whose DA's Office identification was found in the possession of an unauthorized person, was permitted to resign.[90] Yet Ms. Thompson and Ms. Hettiarchchi were both terminated without being given the option of resigning.

Defendants' witnesses claimed in their depositions that the reason for the discrepancy between white ADAs being permitted to resign and ADAs of color not being given that option is that the former Chief Administrative ADA, as a matter of policy, permitted employees who were going to be terminated but that when Edward Heilig assumed that role, he made a policy change and directed that ADAs would no longer be permitted to resign.[91] However, it appears ADA Blakely was permitted to resign since Heilig took over the administrative role.[92] In the last several months, according to media reports, ADA Glenn Kurtzrock was permitted to resign after being found to have failed to turn over exculpatory evidence to the defense. [93]

### III.  ARGUMENT

---

[86] Documents relating to ████ are annexed to Solotaroff Dec. as Exhibit 22.
[87] Id.
[88] Constant Dep., at 30-31; Heilig Dep., at 83-84; Spota Dep., at 47.
[89] Constant Dep., at 32- 33.
[90] Constant Dep. at 56; Spota Dep., at 43.
[91] Constant Dep., at 31-32; Spota Dep., at 26-27.
[92] Heilig Dep., at 82-83.
[93] "Prosecutor Glenn Kurtzrock Steps Down in Suffolk," Newsday May 10, 2017, available at https://www.newsday.com/long-island/columnists/joye-brown/a-prosecutor-steps-down-in-suffolk-1.13605730 ("the actions of [Kurtzrock] were so egregious that Suffolk District Attorney Thomas Spota asked him to resign.")

13

# DEFENDANTS' MOTIONS SHOULD BE DENIED

## A.     The Summary Judgment Standard.

In determining a motion for summary judgment, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Zhengfang Liang v. Café Spice SB, Inc.*, 911 F. Supp. 2d 184, 196 (E.D.N.Y.2012)(internal cites and quotes omitted). The Second Circuit has noted that in employment cases, "an extra measure of caution is merited," in granting summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006).

## B.     Plaintiff Established a Prima Facie Case of Discrimination.

Defendants contend that Ms. Thompson cannot establish a prima facie case for her discrimination claim on the ground that she was not qualified for her position. This is easily rebutted by the written evaluation she received approximately two months prior to her termination.[94] In that evaluation, Ms. Thompson received an overall grade of "Average" and received grades of "Exceptional" in two categories: "Appearance" and "Ethical Obligations." Ms. Thompson also received a "Very Good" grade in the categories of "Maturity," "Preparation for Court" and "Courtroom Demeanor." Ms. Thompson only received a "Needs Improvement" grade in one of the eleven categories in which she was evaluated: "Time Management."

Not surprisingly, courts have consistently found that an employee who receives positive evaluations is qualified for her position. *See e.g. Booth v. Conn. Dep't of Developmental Servs.*,

---

[94] Solotaroff Dec., Ex. 9

14

2011 U.S. Dist. LEXIS 91564, at *33 (D. Conn. Aug. 16, 2011); *Buchanan v. Hilton Garden Inn Westbury*, 2008 U.S. Dist. LEXIS 124756, at *24 (E.D.N.Y. Mar. 12, 2008); *Brown v. Van Nostrand Reinhold Co.*, 1991 U.S. Dist. LEXIS 13299, at *9 (S.D.N.Y. Sep. 24, 1991).

To the extent there could be doubt on this issue, it is resolved by the testimony of Defendant Ewald, Plaintiff's immediate supervisor, who, as Defendants state in their Rule 56.1 Statement, "did not want to terminate Plaintiff's employment."[95]

Defendants also contend that Plaintiff cannot establish the prima facie element that her termination took place under circumstances of discrimination.[96] As Defendants well know, this is a minimal burden. *Bucalo v. Shelter Island Union Free School District*, 691 F.3d 119, 128 (2d Cir. 2012), and can be established by a showing that employees outside of the plaintiff's protected class were treated more favorably. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Here, Plaintiff can point to the other ADAs in the Narcotics Bureau who, according to the key card entries, also came in late and were not disciplined at all, ADA Meg Farrell, who besides her unexcused absences from the office had far more serious performance issues, and was not terminated, and the ADAs with serious performance issues such as being found to have committed sexual harassment, being involved in professional misconduct and criminal conduct, and were permitted to resign.

Defendants, however, did not permit Ms. Thompson or Ms. Hettiarachchi – women of color – to resign.

---

[95] Defs. Rule 56.1 Statement ¶101.

[96] Defendants also rely on the "same actor inference" in claiming that Defendant Spota would not fire an African American after hiring one. But, as courts have found, "the 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand." *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999). As the court in *Copeland* noted, "there are a variety of plausible explanations of such 'hire-fire' conduct that may support an inference of discriminatory animus [including] "supervisors who purposefully hire members of a protected class and then fire them in the hope that the act of hiring will be the focus of attention and will allay any suspicions about other discriminatory acts of the supervisor."

Defendants do not address the more favorable treatment of Ms. Farrell or the ADAs who were permitted to resign but claim that other Narcotics ADAs who came in late to work are not similarly situated because, according to Defendants, their lateness was excused or they had other duties which permitted them to be late. As an initial matter, courts recognize that the issue of whether an employee is similarly situated is generally best left to a jury and should not be decided on summary judgment. *See Graham v. Long Island R.R.*, 230 F.3d 34, 42-43 (2d Cir. 2000)(reversing grant of summary judgment where district court, in finding failure to establish prima facie case, improperly made factual determinations and "applied an unduly inflexible standard" in comparing misconduct of plaintiff and co-workers.) Moreover, a rational jury could easily disbelieve Defendants' contention that the white ADAs in Narcotics had permission to come in late based on Plaintiff's testimony and statement in her declaration that she never heard anyone ask for permission to come in late and was never told that it was necessary,[97] and the complete absence of any supporting contemporaneous documentation, such as the text messages that Ewald testified he would receive when an ADA was late. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000)(casting doubt on defendant's assertion uncorroborated by contemporaneous evidence.)

Finally, the fact that Spota has hired extremely few African American ADAs along with the false explanation that he has been prevented from hiring African Americans because they cannot afford to live in Suffolk County and as a result, "many have turned us down" supports an inference of discrimination. *Windsor v. Tishman Speyer Props.*, L.P., 2002 U.S. Dist. LEXIS 12304, at *13 (S.D.N.Y. July 8, 2002)(employee's allegation that employer hired few African Americans along with stereotypical remarks about African Americans established prima facie

---

[97] Thompson Dep., at 144; Thompson Dec. ¶2.

case).

## C.  Plaintiff Established a Prima Facie Case of Retaliation.

Defendants contend that Ms. Thompson has not established a prima facie case on her retaliation claim.

To establish a prima facie case of retaliation, Plaintiff must establish "1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

With respect to the protected activity element, after a conversation with ADA Wagner in which Ms. Thompson believed that Wagner had referred to her as a monkey, Ms. Thompson sent an email to Ms. Wagner that stated:

> I was taken aback and highly offended by your "monkey in a suit" comment to me yesterday. Such a comment is extremely disrespectful and inappropriate. I expect to be treated in a more professional manner. The term "monkey in a suit" Is unacceptable directed towards anyone but even more so for African Americans given the historical context of the term "monkey" when referring to African Americans.

This email clearly constitutes protected activity which courts define as "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Somehow, Defendants, without citing any authority, contend that Ms. Thompson's email was not opposing discrimination. Had Ms. Wagner not forwarded the email to Defendant Ewald, and had Defendant Ewald not forwarded the email to Ms. Constant, Defendants might be able to contend that they did not know of Ms. Thompson's protected activity. Given that Defendants unquestionably had knowledge of Ms. Thompson's email, they were not permitted to terminate Ms. Thompson's employment in retaliation for it.

Defendants also contend that there is no causal relationship between Ms. Thompson's

complaint and her termination. This is clearly incorrect.

As set forth above, according to Defendant Ewald's notes, he began monitoring the time Ms. Thompson arrived at work two business days after Ms. Wagner forwarded the complaint to Ewald and Ewald forwarded it to Constant. The extremely short temporal relationship between Ms. Thompson's complaint and the commencement of the campaign to get rid of her is highly suggestive of a causal relationship. *See Jeffrey v. Ahmed*, 2011 U.S. Dist. LEXIS 106607 (N.D.N.Y. Aug. 21, 2011)(finding causation where defendant began to retaliate one day after plaintiff's complaint). Indeed, courts have found causation even where the time period between complaint and retaliation is considerably longer. *See Douglas v. HIP Centralized Lab. Servs.*, 2005 U.S. Dist. LEXIS 8753 (E.D.N.Y. Apr. 29, 2005)("Plaintiff's termination by Defendant within a month of his deposition testimony establishes the requisite causal connection to satisfy the final element of Plaintiff's prima facie case."); *Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 2001)(finding causal connection when only twenty days had elapsed between protected activity and termination).

Defendants also rely on Defendant Spota's testimony that he was unaware of Ms. Thompson's email to Ms. Wagner. But there is significant evidence from which a rational jury could infer that Spota's statement is false and that he did know about the "monkey" email. For one, Spota testified that he is a "hands on manager"[98] and based on his management style "I know everything."[99] Clearly, Ewald believed the incident between Ms. Thompson and ADA Wagner to be extremely important. As Ewald testified at this deposition, "this is a serious upon its face, an allegation that I would take very seriously, and I called the chief assistant as soon as I

---

[98] Spota Dep., at 15.
[99] *Id.* at 69.

18

had spoken to [Wagner]."[100]  Moreover, according to Ewald, Constant took it seriously as well:

> [Constant] called me back fairly quickly. I told her what ADA Wagner had related to me, and then ultimately sent a copy of this.
> Q. Okay. What, if anything, did Ms. Constant say to you?
> A. She asked me if I knew whether Kate and Avemaria had ultimately spoken after the email was sent, and I said I didn't know. And she asked me if Avemaria had come to me or texted me or emailed me or communicated with me about this. She had not. And she asked for a copy of it.[101]

It seems improbable that Constant would not tell the District Attorney that an African American ADA had accused a white ADA of calling her a monkey.

Moreover, there are clear indications that Spota and the others involved with Ms. Thompson's termination gave false and misleading testimony in an effort to distance themselves from the evidence of retaliation.  Even though Ewald testified that he prepared the memo to file for Thompson, the only one prepared in the DA's Office at that time, at Constant's express request,[102] Constant denied knowledge of that request.[103] Spota testified, clearly falsely, that Constant told him that she did not know of the "monkey" email at the time it was sent.[104] Moreover, Spota testified that he did not know at the time that Heilig was reviewing Thompson's key card entries,[105] even though Constant testified that Spota requested Heilig to perform the review.[106]  Finally, Spota demonstrated his willingness to testify falsely to avoid evidence of his discriminatory conduct (as well as his belief in racist stereotypes) when he testified falsely that many African American ADA candidates turned down his offers of employment because they could not afford to live in Suffolk County.

Based on the evidence that he likely knew of the "monkey" email and his false statements

---

[100] Ewald Dep., at 106.
[101] *Id.* at 108.
[102] Ewald Dep., at 157.
[103] Constant Dep., at 77.
[104] Spota Dep., at 72
[105] Spota Dep., at 35.
[106] Constant Dep., at 81.

concerning the email and other evidence, a rational jury could easily reject Spota's self-serving statement that he had no knowledge of Ms. Thompson's complaint at the time he terminated her. There is clearly a prima facie case of retaliation.

**D.** **There Are Issues of Fact Concerning Whether The Basis For Plaintiff's Termination Was Pretextual and Whether Plaintiff Was Terminated for Discriminatory and/or Retaliatory Reasons.**

There is substantial evidence from which a rational jury could conclude that Ms. Thompson's lateness was not the true reason for her termination.

First, as set forth above, a significant number of the other ADAs in the Narcotics Bureau arrived for work after 9 a.m. – some with an average arrival time that was extremely close to Ms. Thompson's average arrival time and two ADAs who arrived after Ms. Thompson. None of these ADAs were terminated or subjected to any discipline whatsoever. Second, a former ADA, Meg Farrell, who also worked in Narcotics, had more serious attendance issues than Ms. Thompson, in that, according to Defendant Ewald, she was absent from work during the busiest part of the day and absent for whole days without notice. Moreover, ADA Farrell had additional, extremely serious performance issues, such as improper socialization with a judge (including practicing her golf putting in the judge's chambers) that created an appearance of impropriety, making unauthorized plea offers, and having speedy trial issues with her cases. Significantly, Defendant Ewald regularly communicated with Defendant Spota and other senior administrators concerning ADA Farrell. Yet ADA Farrell remained employed by the Suffolk DA's Office for over three years after her performance issues began being documented and was never terminated. Finally, ADAs in other Bureaus were not terminated, but permitted to resign, after engaging in conduct unquestionably more serious than Ms. Thompson's lateness. This conduct included ███████ and Ron Lippets, who were found to have engaged in sexual harassment of other employees,

20

Michael Blakely, who had been involved in a motor vehicle accident, while driving while intoxicated and whose DA's Office identification was found in possession of an unauthorized person, and Glenn Kurtzrock, who according to media reports, was permitted to resign even though he had engaged in professional misconduct by failing to disclose exculpatory evidence to the defense resulting in a murder case being disposed of on extremely favorable terms for the defendant.

Courts recognize that summary judgment is inappropriate where there is evidence of employees outside the plaintiff's protected class being treated more favorably after having engaged in similar or more serious misconduct. In *Windham v. Time Warner, Inc.*, 275 F.3d 179, 190 (2d Cir. 2001), for example, the court reversed a grant of summary judgment where many of plaintiff's co-workers were late and a rational jury could have concluded that the defendant's concern about the plaintiff's lateness was used to mask a pretextual decision. *See also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998) (inconsistent application of company disciplinary policy sufficient for jury to find that employer's defense was pretext for discrimination); *Peralta v. Roros 940, Inc.*, 72 F. Supp. 3d 385,394 (E.D.N.Y. 2014)(in pregnancy discrimination action, summary judgment denied based on evidence that non-pregnant co-workers were guilty of same infraction but not disciplined); *Delia v. Donahoe*, 862 F. Supp. 2d 196, 215 (E.D.N.Y. 2012)(denying summary judgment where plaintiff was terminated for acting in a threatening manner and comparators were not terminated after having engaged in physical altercations); *Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 344 (S.D.N.Y. 2001)(denying summary judgment where female plaintiff terminated for alleged failure to get along with co-workers while male comparators promoted after being subject of race discrimination complaints).

An additional basis for the court to find pretext and deny summary judgment is Defendants' failures to follow their ordinary procedures in dealing with ADAs with performance issues. Defendant Spota testified at his deposition that the Suffolk DA's Office practices "progressive discipline" which he described as a "a graduated form of discipline, starting with the lowest step, getting together, some form of conciliation. And then if that is not working, it is an increasing series of disciplines." The goal of this system, according to Spota, is that "termination of the employee should be the last resort." It is clear from the evidence produced in discovery that progressive discipline was practiced with respect to white ADAs with performance issues. With Defendant Spota's knowledge, the supervisors of ADAs Farrell and ███████ met with them on multiple occasions to improve their performance. In these meetings, the supervisors provided the poor performing ADAs with warnings that Defendant Spota and other top administrators were concerned about their problems. Meanwhile, there was absolutely no progressive discipline with respect to Ms. Thompson or Ms. Hettiarchchi. Based on the evidence produced in discovery, she received one email, in 2011, about her lateness and then it was discussed in an otherwise positive review two months prior to her termination. Thereafter, not only did Defendants not warn Ms. Thompson that her employment was in jeopardy, they practically concealed it by not advising her that they were monitoring her arrival at work and investigating her prior key card entries. Defendant Spota even asked Defendant Ewald to continue to monitor Ms. Thompson's arrival at work after he terminated her, suggesting that Spota was trying to build a case to justify the termination.

The Second Circuit has recognized that a departure from employers' usual processes can indicate pretext. *In Stern v. Trs. of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997), the court reversed a grant of summary judgment in a failure to hire case where the defendant deviated

22

from its standard hiring procedures and hired a candidate of a different race and sex than the plaintiff. Courts also find pretext when employers deviate from their usual disciplinary process in terminating an employee. *See Weiss v. JPMorgan Chase & Co.,* 332 F. App'x 659,664 (2d Cir. 2009) (reversing grant of summary judgment where plaintiff submitted evidence that defendant failed to adhere to customary use of other sanctions short of termination); *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.,* 2008 U.S. Dist. LEXIS 58040 (S.D.N.Y. July 30, 2008)(denying summary judgment where defendants failed to follow usual processes in providing warnings to plaintiff before termination).

If anything, the evidence of pretext on Ms. Thompson's retaliation claim is even stronger. After all, even though Ms. Thompson had been coming in late to put her children on the bus throughout her time in the Narcotics Bureau, there was no indication it was an issue -- let alone a significant issue, until after she complained about the monkey comment. Prior to that, the entire written communication or documentation concerning Ms. Thompson's lateness was a single email in May 2011 reminding her to be in the office by 9 a.m. "particularly on JDP days." Yet after Ms. Thompson sends the "monkey" email, Ewald immediately starts monitoring her time, Spota directs Heilig to investigate her key card entries, and she is terminated approximately three months later.

Moreover, the evidence of false and contradictory statements by Spota and Constant about their involvement and knowledge of Ms. Thompson's complaint and the key card investigation are also evidence of pretext, as is Heilig's clearly false testimony that he began investigating Ms. Thompson's key card entries to determine the truth of her statement that other Narcotics ADAs were late,[107] even though Ms. Thompson made that statement at her termination

---

[107] Heilig Dep., at 102

23

meeting, after Heilig had already completed his review.[108]  *See EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (reasonable jury could infer pretext from discrepancies in employer testimony regarding reasons for termination); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 261 (S.D.N.Y. 2009)(plaintiff may also demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.")(internal citation omitted).

Finally, a rational jury could infer pretext from Heilig and Constant's false statements that they investigated the complaints that Ms. Thompson made in the termination meeting by subsequently speaking to Defendant Ewald and ADA Wagner.[109]  *Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 343 (S.D.N.Y. 2001)("pretext can also be shown by demonstrating inconsistent statements in contexts other than those made in connection with plaintiff's termination.").

E.      **There Are Issues of Fact On Plaintiff's Hostile Work Environment Claim.**

As set forth above, Ms. Thompson claims that in the Narcotics Bureau, she was constantly singled out, based on her race, for harassment by ADA Scarglato including his locking her door and hiding her key on a daily basis and his telling her she could not read a communal newspaper that he permitted her colleagues to read, being asked to read a pornographic poem by Defendant Ewald, being exposed to Defendant Ewald's racial and sexual comments, such as discussing Jamaican men penis sizes, and being referred to as a monkey by ADA Wagner.

---

[108] The key card review clearly took place in early May 2013, weeks before Ms. Thompson's termination. *See* Key Card Printout, dated May 3, 2013, attached as Exhibit 23 to Solotaroff Dec.

[109] Ewald Dep, at 139; Constant Dep., at 42. Both Ewald and Wagner denied speaking with anyone about the allegations after Ms. Thompson's termination.  Ewald Dep., at 198; Wagner (Fohrkolb) Dep., at 40.

Defendants make the unsupported categorical allegation that this claim is barred by the statute of limitations. However, Scarglato's conduct continued at least until Ms. Thompson sent him an email in January 2012, Ms. Thompson testified she was asked to read the poem as late as 2011,[110] and Wagner's statement was made in 2013. Given that Ms. Thompson filed her EEOC complaint in October 2013,[111] the claim is timely.

Defendants also claim that the harassment was not severe enough to create a hostile work environment, relying on cases holding that sporadic incidents of harassment were not actionable. But what Defendants miss is that Ms. Thompson experienced daily harassment at the hands of Scarglato. Courts have found daily acts of harassment sufficient to create a hostile work environment. *See, e.g., Muktadir v. Bevacco Inc.*, 2013 U.S. Dist. LEXIS 113967 (E.D.N.Y. Aug. 13, 2013).[112]

---

[110] Thompson Dep., at 10.

[111] Letter from New York State Division of Human Rights re Cross-Filing of Complaint with EEOC, October 2, 2013 (Annexed as Exhibit 24 to Solotaroff Dec.)

[112] Defendant Suffolk County also claims that it is entitled to the Faragher-Ellerth defense. But it failed to prove that no issue of fact exists as to whether Defendants' anti-harassment policy was effective and whether Ms. Thompson was unreasonable in complaining about discrimination and harassment only to the individuals directly involved in the discriminatory behavior. First, the formal existence of an anti-harassment policy is not dispositive to establishing that the employer actually exercised reasonable care to prevent and correct discriminatory harassing behavior. Plaintiff may rebut this evidence with proof that the policy was ineffective. *See, e.g., Little v. NBC*, 210 F. Supp. 2d 330, 393 (S.D.N.Y. 2011) (denying summary judgment where a genuine issue of fact existed as to whether employer's policy was effective.) Here, the Suffolk DA's Office policies against harassment and discrimination were, for all practical purposes, non-existent. There was no anti-harassment or discrimination training. Perhaps as a result, senior supervisors such as Defendant Ewald could not define sexual harassment, describe the process of complaining about sexual harassment, or even say to whom complaints of sexual harassment or discrimination should be directed. Even Defendants' senior administrators were confused about the policy. There was also no specific policy against retaliation for making discrimination or harassment complaints in the Suffolk DA's Office. Secondly, there is an issue of fact as to whether Ms. Thompson's failure to complain to Mr. Heilig or Ms. Constant was unreasonable, given the absence of any real anti-discrimination, anti-harassment or anti-retaliation policy and uncertainly as to the avenues of redress. Under the circumstances, a jury can find that Ms. Thompson's raising the issue directly with the people who were harassing her was reasonable. *See, e.g., Fairbrother v. Morrison*, 412 F.3d 39 (2nd Cir. 2005)(reversing judgment as matter of law in favor of the employer where it failed to present the evidence of employee's unreasonableness of her failure to complain "so 'overwhelming' that the jury could rationally reach no other result.")

## CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion for summary judgment.

Dated: New York, New York
October 20, 2017

GISKAN SOLOTAROFF & ANDERSON LLP

/s

By: _____

Jason L. Solotaroff
Aliaksandra Ramanenka
217 Centre Street, 6th Floor
New York, New York 10013
Telephone: (212) 847-8315
*Attorneys for Plaintiff*